## THE QUANTICO COTTON.[1]

### EVANS and others v. STATE NAT. BANK.[1]

*(Circuit Court, E. D. Louisiana.* June 20, 1885.)

CONVERSION AND SPOLIATION.

In order to hold a party for an alleged conversion and spoliation, it is necessary to prove, either that he or his agents participated in the conversion, or received or benefited by the proceeds of the conversion, in whole or in part.

In Chancery.

*Albert G. Brice* and *Albert H. Leonard,* for complainant.

*James McConnell,* for defendant.

PARDEE, J. The facts as claimed by complainant are as follows: On December 27, 1859, S. D. Linton, a very wealthy planter, executed a mortgage on a valuable plantation situated in the parish of Rapides, known as the "Quantico Plantation," and on the improvements thereon, and the stock, cattle, horses, mules, farming utensils, implements of husbandry, and 195 slaves thereto attached, to secure a debt of $130,000, which he owed his commission merchants, W. & D. Urquhart, of New Orleans, evidenced by 12 notes, each for $10,-833.33⅓, drawn to his own order and by him indorsed, maturing January 10-13, February 10-13, March 10-13, and March 15-18, of years 1861-62-63. A few days after, the Louisiana State Bank, now the State National Bank, discounted three of said notes, viz., those maturing February 10-13, March 10-13, and March 15-18, A. D. 1862, and received four of said notes, viz., those maturing January 10-13, 1862, February 10-13, March 10-13, and March 15-18, 1863, as collateral to secure payment of note given by W. & D. Urquhart to the bank for money borrowed equal to the face amount of the notes pledged.

The ability of Linton to provide for his notes was not questioned by himself or those who held them. They would doubtless have been met when due, but shortly before the notes first falling due matured, the country was precipitated into a revolution. Louisiana seceded,

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

joined other states in creating the Southern Confederacy, and marshaled all her resources to meet the shock of rapidly approaching war. The state became a military camp; her people were wild with excitement; the ordinary affairs of life were ignored or neglected, and confusion reigned.

In view of probable contingencies, Linton (as he stated under oath) effected an arrangement by which the notes falling due in 1861 were extended one year. Such being the situation, on March 15, 1861, W. & D. Urquhart, who, for some cause, real or fancied or feigned, considered, or affected to consider, themselves in some manner aggrieved by Linton, instituted in the Fourth district court of Orleans parish a suit against him for $3,108, based on an open account, and on commissions alleged to be due on cotton, which they claim should have been shipped to them by Linton. On the same day, and in the same court, David Urquhart, one of the firm of W. & D. Urquhart, instituted cause No. 14,665, entitled *David Urquhart v. S. D. Linton,*—a suit for executory process. In the petition signed by J. K. Elgee, attorney, it is alleged that Linton is indebted to Urquhart in the sum of $32,500, with interest for three of the notes hereinbefore mentioned, viz., those maturing respectively January 13, February 13, and March 13, 1861. The mortgage executed by Linton is made part of the petition, and an order of seizure and sale prayed for. On the same day an order of seizure and sale was granted, directing the sheriff of Rapides parish to seize and sell the property mortgaged, for cash, to satisfy amount sued for, "and on such terms of credit as will correspond with the falling due of the remaining nine notes, set forth and described in the act of mortgage aforesaid."

A writ of seizure and sale issued in said cause, No. 14,665, directed to the sheriff of Rapides parish, under which that officer advertised the mortgaged property for sale on the first Saturday in May, 1861. This writ does not appear in the transcript; it was neither executed nor returned, and was destroyed, with all other papers of the sheriff's office, when the court-house of Rapides parish was burned by the federal army, in 1864. The sheriff made a mere paper seizure, if any. He certainly did not take actual possession of the property mortgaged; it remained in Linton's possession, and was managed and controlled by him, through his overseers and agents, until August, 1863. The execution of this writ was enjoined by Linton, who, on April 20, 1861, instituted, in Fourth district court of Orleans parish, suit No. 14,846, entitled *S. D. Linton v. D. Urquhart.* In his petition Linton alleged that, by agreement between himself and Urquhart, the time for payment of all notes which on their face matured in 1861, including those sued on by Urquhart, had been extended one year. On Linton's affidavit to that effect, and in accordance with the prayer of his petition, an injunction was granted by the judge of the Fourth district court against D. Urquhart and the sheriff of Rapides parish, ordering them to suspend the sale of said mortgaged property under the said

writ of seizure and sale issued in the suit of *D. Urquhart* v. *S. D. Linton*, No. 14,665, until the final hearing and decision of the suit instituted by *Linton* v. *Urquhart*. On this order writs of injunction were issued to David Urquhart and to the sheriff of Rapides. No further action has since been taken in said cause.

In April, 1862, the federals captured New Orleans, and in a short time thereafter occupied and held, until the close of the war, a considerable portion of southern Louisiana. Meanwhile their fleet ascended the Mississippi river and the Red river, and some time in the spring of 1863 held Alexandria, on Red river, in Rapides parish, for a few days, the Confederate forces resuming possession when the gun-boats withdrew; and from that time until the Banks expedition arrived in Rapides, in the spring of 1864, the Confederate army held the parish, and the Confederate government was paramount therein. It was evident, however, that the federals could occupy Alexandria or any other place on a river navigable by their gun-boats whenever they desired to do so, and this fact was well known by the parties through whose combined action Linton was despoiled of his property.

In the month of April or May, 1863, Linton, accompanied by his wife, went to the Quantico plantation. It was then in his possession and under his exclusive control. He placed an overseer or manager in charge of the place; employed an engineer,—there being a steam-gin on the plantation,—and, remaining only a short time, went to Texas, and from there to Cuba, and from there, in the fall of 1863, to Europe, where he remained until after the close of the war.

On the twenty-first day of August, A. D. 1863, J. K. Elgee, the same attorney who represented Urquhart and Cohen in their suits against Linton, instituted in the parish of Rapides two other suits against Linton,—one in the name of Urquhart, and one for the Louisiana State Bank,—in which suit two writs were issued by the clerk of the district court of Rapides, and by that officer placed in the hands of the deputy-sheriff of the parish, John Clements, then in full and sole charge of the sheriff's office, the sheriff being absent in the Confederate army.

Under these writs, and acting under written instructions given by J. K. Elgee, attorney of the plaintiffs in said suits, Clements seized some 1,800 bales of cotton, (or rather cotton amounting to some 1,800 bales, only a portion of it being baled at the time,) the property of S. D. Linton, and then on the Quantico plantation; served notice of seizure on William Morris, who had been left in charge of the plantation when Linton went to Europe; and, still acting under Elgee's written instructions, appointed J. Madison Wells keeper of the property he seized, and put him (Wells) in possession of same. These suits, writs, instructions of Elgee, attorney, and sheriff's returns, showing seizure, were all destroyed with the court-house of Rapides parish, when that building was burned, in 1864. Some months after Wells had been put in possession of Linton's cotton, he left Rapides parish and came to

New Orleans, where he remained some time, became a candidate for the office of lieutenant governor of Louisiana, at an election held under federal auspices in February, 1864, and was elected. Meanwhile, Gen. Banks was moving northward on his Red river expedition, and Wells returned to Rapides with him. The expedition continued on to Mansfield. On his return, Wells chartered a railroad which ran from Alexandria through the Quantico plantation to Lecompte, and by means of this railroad removed to Alexandria all of the cotton which he held as keeper. The federal forces were repulsed at Mansfield and retreated, making, however, a stand at Alexandria for several days. During their stay, Wells managed to ship on government transports, which accompanied the Banks expedition, the cotton which he had brought into Alexandria from the Quantico plantation. A portion of the same, about 1,000 bales, was carried to New Orleans, and the balance, about 800 bales, was taken up the Mississippi river to some point in Illinois. The cotton which arrived at New Orleans was consigned to and received by C. A. Weed & Co., who sold same and paid to Wells net proceeds thereof, some $340,000. The evidence gives no further account of the cotton, worth at that time at least $300,000, which went up the Mississippi river.

Linton, absent in Europe, had no knowledge of the seizures made in 1863, or of the removal of his cotton, and died ignorant of the facts. In 1866 he was interdicted by one of the courts of Paris, France, where he then resided, and soon thereafter, to-wit, in the early part of the year 1867, died. Meanwhile, after the close of the war, and some time in the fall or winter of 1865, Linton, with his wife, came back to Louisiana, remaining in New Orleans some months. Linton's mental condition, however, prevented him from learning the true condition of his affairs, and his wife, reared in luxury, was absolutely without any experience in matters of business. They returned to Paris some time in the year 1866, no wiser than when they left there. Linton died in Europe as stated. His widow remained there until the winter of 1869–70, when she returned to this country, where she has since lived. Some time after her return she was informed of the facts hereinbefore stated, and thereupon commenced a struggle, against desperate odds, to compel the spoliators to account for the property which they had wrongfully taken.

Before proceeding further it may be well to state: (1) That the Louisiana State Bank was, some time since, changed into a national bank, and is now known as the State National Bank. It is conceded that the State National Bank succeeded to all the rights and is liable for all obligations of the Louisiana State Bank. For convenience it will be referred to as the bank. (2) The succession of Linton is now represented by the complainant, Marie P. Evans, his widow, executrix of his last will, in which she is constituted his sole universal legatee.

The State National Bank, the only contesting defendant, in a

lengthy answer, responsive to the bill and amended supplemental bills, denies all participation in and responsibility for any and all acts charged by the complainants, so far as any liability is sought to be attached to the bank.

From the evidence in the case I find:

1. The seizure of the Quantico plantation in the suit of *Urquhart* v. *Linton*, No. 14,665 of the docket of the Fourth district court of New Orleans, was actual seizure, and thereunder J. M. Wells was appointed keeper, and as such keeper had possession. This appears by the averments of complainants' bill; by the record of the case No. 14,665; by the judicial allegations and admissions of Linton in his suit, No. 14,846, of the same court, for an injunction; by the testimony of Wells, who swears he was appointed keeper under the process which issued from the Fourth district court of New Orleans; and by the testimony of the complainant herself, who swears that in the early spring of 1863 she was herself on the plantation, and that the property was then in the possession of Gov. Wells, who was living on the place in possession and charge.

2. It is not satisfactorily shown that any suit was entered by the Louisiana State Bank against Linton in 1863, nor that any seizure of Linton's property was made in that year on behalf of the bank. Neither the original in this case nor any of the supplemental or amended bills allege any such suit and seizure; the only allegation on the subject being, "that during the time of such occupation by said David Urquhart, and on or about the twenty-first of August, A. D. 1863, the defendant the State National Bank of the city of New Orleans, then known as the Louisiana State Bank, joined with the said defendant David Urquhart in the possession of the said above mentioned and described piece or parcel of land, and continued in such possession and occupancy until on or about the ——— day of January, A. D. 1869."

Such suit and seizure were very unlikely proceedings to be had at that time. The State Bank was in the hands of loyal liquidators, appointed by the general commanding the United States forces in Louisiana; the parish of Rapides was at best debatable ground, with none but a Confederate court and officers; and whether such a suit was instituted in Rapides or Orleans parish, it is not likely that a seizure could have been made in Rapides, except, perhaps, in the latter case, during the short time the federal troops occupied the parish in 1863, and any such seizure would have been vain and illusory. The main witness on this point, Clements, who testifies that he was the deputy-sheriff that made the seizure, says the suit was instituted in Rapides, and was during the federal raid of 1863, which, he says, lasted about 10 days, and that he then and there appointed Wells keeper. The witnesses Mrs. Morris and Jackson Johnson, whose testimony was taken 21 years after, are certain that Clements made the seizure at the suit of the bank, on process from Rapides parish, in August, 1863,

and then and there appointed Wells keeper. Henry Perkins, uncle of complainant, and to some extent agent for Linton, swears he was on the place in September or October, 1863; that Wells was in charge as keeper; that he saw his authority, and it was signed by Neal, the sheriff.

Wells swears that he was appointed under process from the Fourth district court in New Orleans, and in this he is corroborated by the appointment (a copy of which is in record 14,665) from said Fourth district court. It is argued strenuously that as both complainant and defendant agree that in 1865 the court-house and records of Rapides parish were destroyed, that the papers presented in 1865, in the Fourth district court, purporting to be the original order of seizure and sale in No. 14,665, and the appointment thereunder of Wells as keeper, were manufactured for the occasion. The high character of the attorneys appearing at that time in this case, one of whom (Senator Jonas) swears that he saw the originals, forbids the court from such conclusion. And what more natural than that Gov. Wells, as keeper, should have in his possession his appointment as keeper? Henry Perkins, whom the complainant ought not to dispute, swears that Wells showed it to him in September or October, 1863.

It seems to me, from all the circumstances in proof, that Deputy-Sheriff Clements, from lapse of time and confusion of seizures, is mistaken, and that the witnesses Mrs. Morris and Jackson Johnson are not entitled, under the circumstances, to much credit when they swear so positively as to the bank's being creditor in a suit between other parties 21 years before. The history of this case, as shown by the pleadings, strongly tends to show that their testimony was an after-thought or lucky find for the complainant, if not to themselves.

3. The evidence does not show that the bank had any hand in the removal and conversion of cotton from the Quantico plantation at any time during or after the war; nor that any agents of the bank had anything to do with such removal and conversion. There is a great deal of hearsay evidence to the effect that Wells and the parties who assisted in bringing cotton out of Red river in 1864, and in selling and disposing of it, said at times that "the bank had an interest,"—"that the bank had a lien;" "that Wells said, in removing cotton from Quantico, he acted as agent of the bank;" "that Weed & Co. said it was cotton which had been seized by some bank;" but there is no evidence shown that any agent of the bank had anything to do with the removal and conversion of any cotton, except that of V. A. Ward, secret service officer, who says that he reported to Col. C. W. Kilbourne, provost marshal, that cotton was brought to New Orleans on government transports attached to the Banks expedition, and that J. Madison Wells had some connection with it; that thereupon Col. Kilbourne sent him (Ward) for J. M. Lapeyre, who came to the provost marshal's office, and thereupon the "provost marshal asked him about the cotton that came down the river, supposing it to

be John A. Stevenson's, who had a contract to bring in cotton which the government had an interest in to a certain extent, and he said no; it was cotton that he had got a permit to bring in. *It was Madison Wells' cotton, which the bank had a lien upon.*"

Col. Kilbourne, the provost marshal, testifies that he sent for Lapeyre at the instance of Gen. Bowen, and that the interview with Lapeyre was in the presence of Gen. Banks, Gen. Bowen, and himself, and that Lapeyre explained that it was not Stevenson's cotton, but cotton purchased with money belonging to some other fund, and he says nothing of any claim on the part of the bank. Now Lapeyre had been president of the Louisiana State Bank, and was, at that time, one of the three military liquidators and commissioners of the bank. That he was engaged in cotton speculations, and was interested with Wells and others in the cotton brought from Red river, may be conceded, and still the case is far from showing that in such interest with Wells he (Lapeyre) represented the bank, or pretended to do so. Nothing would be more natural, if Wells and others were engaged in spoliating the owners of cotton and bringing it in through the Union lines, than for them to answer that the bank had "an interest," or "a lien," well knowing that the bank was in the hands of a loyal commission, under the protection of the general commanding, and that the bank held large mortgage interests on plantations, and on "Quantico" in particular.

4. The case shows that on June 11, 1863, the commanding general of the department of the gulf, by special order No. 138, appointed Col. C. C. Dwight, A. Miltenberger, and J. M. Lapeyre commissioners to effect the liquidation of the Louisiana State Bank, and ordered that the said commissioners enter upon the discharge of their duties immediately, and that accordingly, on the seventeenth of June, over the protest of the president and board of directors of said bank, the said commissioners took possession of all the assets, affairs, and business of said bank, ousting the directors from all control, and that the affairs and control of the bank remained in the hands of said commissioners, and out of the control of its legal board of directors, until Gen. Canby restored the bank and its affairs to the directors and stockholders in January, 1866. This period, from June 17, 1863, to 1866, covers the time of all operations complained of in the present case.

5. There is no evidence to show that any of the proceeds of the alleged spoliation and conversion of the "Quantico" cotton ever came to the hands of the bank, or to the hands of any of its agents for the bank; while the sworn answer of the bank, and the evidence of Samuel H. Kennedy, a director from before 1863 till now, and for many years president of the bank, and that of C. L. C. Dupny, cashier, is positive that the bank received no part or parcel of such proceeds; and they are corroborated by the books and records of the bank covering its entire history.

The evidence in this case is very voluminous, and relates to many

matters I find no time nor necessity to review, for they throw no light upon the issues as I understand them.    It seems to me very clear that in order to hold the bank liable for the alleged conversion and spoliation it is necessary to find that either the bank, through its agents, participated in the conversion, or received or benefited by the proceeds of the conversion in whole or in part.    Under the evidence in this case, and the facts as I have found them, neither of these is shown, nor is there under the evidence a well-founded suspicion that the bank was guilty of either.    Whatever figure the agents of the bank cut in the whole matter (and we have proof only of the single declaration of Lapeyre, military commissioner, as testified to by Ward) would not, in my judgment, bind the bank, even if it had been in the control of its own agents; but when it is considered that at that time the bank was in the possession and under the control of the military authorities, and not under the control of its directors and stockholders, it would seem preposterous to hold the bank responsible for torts and wrongs with which the stockholders and directors had nothing to do, and that, too, on flimsy hearsay evidence, only supported by Ward, who is directly contradicted by Kilbourne.    That wrongs were committed by the military liquidators, and that the bank ratified them by its stockholders resuming control, is an assumption without proof, and a conclusion that does not follow.

A decree will be entered dismissing the bill and amended supplemental bills as to the State National Bank, with costs.