Hollis CROWE, Plaintiff-Respondent,

v.

Bob COURSEY, Anny H. Coursey, his wife, and Bobby Coursey and Gary Coursey, minors through their duly appointed and acting Guardian ad Litem, Randall Smith, Defendants-Appellants.

No. 11355.

Missouri Court of Appeals, Southern District, Division One.

June 23, 1980.

Ronald L. Holmes, William L. Mauck, Yates, Mauck & Robinett, Springfield, Randall Smith, West Plains, for defendants-appellants.

Richard D. Moore, Kenneth A. Wagoner, Moore & Brill, West Plains, for plaintiff-respondent.

FLANIGAN, Chief Judge.

Plaintiff Hollis Crowe brought this action against defendants Bob Coursey, his wife Anny Coursey, and their minor sons, Bobby Coursey and Gary Coursey. The petition alleged that the defendants "prior to and on July 9, 1977, did steal and convert" 117 head of Beefmaster cattle owned by plaintiff. Bob filed a counterclaim and Bobby and Gary jointly and individually filed counterclaims.

The trial court, sitting without a jury, found that the defendants sold 117 head of Hollis's cattle on July 9, 1977, thereby converting the cattle. The trial court also found that the 117 head had a fair market value of $58,500 and entered judgment in that amount in favor of Hollis and against all the defendants. Defendants were denied relief on their respective counterclaims. Defendants appeal.

Defendants' assignments of error, which will be set out more specifically when they are respectively ruled, challenge the judgment on these grounds: The evidence is insufficient to show that Hollis owned the 117 head of cattle which were sold on July 9, 1977; the evidence is insufficient to justify the amount of the judgment; the evidence is insufficient to show that Bob and Anny participated in the sale of the cattle to the extent that they were liable, jointly with Gary and Bobby, for their conversion; the relationship between Hollis, on the one hand, and Bob, Bobby and Gary on the other, was that of partners and a conversion action will not lie until that partnership has been terminated by an accounting.

Hollis and Bob are half brothers. In 1970 Hollis lived in Houston, Texas, where he operated a computer business. Hollis described himself as a computer consultant. In the fall of 1970 the defendants moved from Nebraska to Missouri and lived on a farm on Lebo Route near West Plains. Bob then owned 40 or 50 head of female "grade" heifers. Hollis was interested in the Beefmaster breed of cattle and wanted to "try out" Beefmaster bulls on grade cattle. Pursuant to an agreement between Bob and him, Hollis purchased two bulls and sent them to Bob's place on Lebo Route. The arrangement was that Bob was to "look after" the bulls, use them on Bob's grade heifers, and permit Hollis to observe the effect of the breeding. Hollis was to have no interest in the calves and in fact Bob sold the female cattle before they calved.

In February 1971 Hollis purchased a 330-acre farm in Howell County, which he named "Copperhead Ranch." According to Hollis the arrangement between him and Bob was that Hollis would put $8,000 into a West Plains bank account, $5,000 of which was to be used for the down payment on the ranch and $3,000 was to "take care of certain improvements." The labor involved in the improvements was to be done by Bob and the plan was that Copperhead Ranch would be sold within a year and the net profit would be divided equally between Bob and Hollis. Although Bob did some work in connection with the improvements, only $975 of the $3,000 was spent on improvements and the balance was used by Bob for his personal and family expenses. In December 1971, without informing Hollis of his plans, Bob went to South America where he intended to be employed for two or three years. In February 1972 Bob returned from Bolivia. Hollis told Bob that he "wanted out" of the arrangement concerning the improvement and sale of Copperhead Ranch and Bob assented.

In May 1972 Hollis hired Bob to do some fencing at Copperhead Ranch for a monthly salary of $50, which was increased from time to time. In December 1972 Hollis purchased, for $20,000, 40 registered Beefmaster heifers in Texas and sent them to Copperhead Ranch. These cattle were to be used for breeding purposes and were worth more than grade or "commercial" cattle which are raised for slaughtering. The major dispute centered around these Beefmaster heifers and their offspring produced from their being bred to the Beefmaster bulls acquired by Hollis earlier.

According to Hollis, whose version was accepted by the trial court, none of the defendants had any ownership interest in any of the cattle on Copperhead Ranch although Hollis permitted Gary and Bobby each to select one heifer from the initial calf crop. Hollis's arrangement with Bob was that Bob was to be the manager of the Copperhead Ranch. Bob was in the business of raising hogs and horses and he was permitted to raise those animals at the ranch. Bob was not to raise any cattle of his own at the ranch. Hollis said that "all of the cattle at Copperhead were mine."

In May 1973 the defendants moved to Copperhead Ranch and lived there, rent-free, until 1977. During that time Bob, Gary and Bobby cleared a substantial portion of the ranch and built some improvements, including a pole barn and some corrals. During that period Hollis paid Bob $4,795.50 in salary, paid the other defendants $3,028.85 for labor, provided the defendants with electricity worth $2,385.62 and telephone services worth $849, made

payments on defendants' house trailer in the amount of $3,152, and furnished defendants with a gas tank and gasoline worth $2,992.

Gary, testifying for himself and the other defendants, claimed that Hollis gave the two Beefmaster bulls to the defendants. With regard to the 40 Beefmaster heifers, it was Gary's testimony that the defendants were to take care of the heifers and their offspring. In return Gary was to be the owner of 10 of the heifers and Bobby was to be owner of another 10. The other 20 were to remain the property of Hollis. Each owner was entitled to the offspring of his heifers. When these arrangements were allegedly made, Gary was 11 or 12 and Bobby was 12 or 13. The trial court did not believe Gary's version of the arrangements.

In July 1977 Gary and Bobby, assisted by other men, rounded up 117 head of cattle at Copperhead Ranch, took them to a livestock auction barn, and sold them in three lots. The three checks representing the proceeds were in the respective amounts of $18,-721.72, $1,091.42, and $184.48. Only 8 or 9 head were left on the ranch.

Hollis, in Texas, received a midnight telephone call from an anonymous source informing him of the cattle sale. He returned to Missouri and filed attachment proceedings against the defendants, in the course of which payment on the two smaller checks was stopped. The $18,721.72 check, which was payable to Gary and Bobby, was endorsed by them and given to their mother Anny. Using that check, Anny obtained a cashier's check which Bob succeeded in cashing in Arkansas for an amount somewhat less than its face value. The proceeds of that check were used by Bob and Anny to purchase land to which the two of them took legal title.[1]

Defendants' first point is that the trial court erred in receiving into evidence plaintiff's Exhibit 14, a computer printout, and that the evidence is otherwise insufficient to show that the 117 head of cattle involved in the sale of July 9, 1977, were owned by Hollis.

Exhibit 14 was based upon the "input data" which Hollis fed into a computer. All of the input data were given Hollis by the defendants. Apparently plaintiff's purpose in offering Exhibit 14 was to show the number of cattle at Copperhead Ranch in 1976. When Exhibit 14 was offered, defendants objected to it on the grounds that it was "self-serving, hearsay, and the records were not kept contemporaneously with the events which occurred and the [input data] are not available."

Defendants have not challenged Hollis's expertise as a computer operator nor have they challenged the reliability of the machine itself. Although defendants argue that the inventory was based upon past events, that argument is factually unsound for the reason that Hollis testified that the inventory "was of that time," meaning the time when he received the information from the defendants. Hollis was in the cattle business and the defendants have not pointed out in what respect the placing of the information in the computer was not in the regular course of Hollis's business.

The major objection which defendants voice on this appeal is that the papers embodying the input data were destroyed after the information they bore was fed into the computer. That objection has no merit.

Cases dealing with the admissibility of computer printouts include *Union Elec. Co. v. Mansion House Ctr. No. Redev. Co.*, 494 S.W.2d 309 (Mo.1973); *Missouri Val. Walnut Co. v. Snider*, 569 S.W.2d 324 (Mo.App. 1978); *Sears Roebuck & Co. v. Merla*, 142 N.J.Super. 205, 361 A.2d 68 (1976); *King v. State ex rel. Murdock Acceptance Corp.*, 222 So.2d 393 (Miss.1969); Anno. 11 A.L.R.3d 1377. See 32 C.J.S. Evidence § 682(1).

■ In *Missouri Valley* the court defined the foundation which must be laid to introduce a computer printout and pointed out that considerable discretion rests in the trial

---

1. One of the counts of the petition sought to place a constructive trust on the land purchased by Bob and Anny. The trial court denied plaintiff relief on that count. Plaintiff did not appeal from that ruling.

court in ruling on its admissibility. None of the cited cases holds that preservation of the original records containing the input data is a condition for admissibility of the printout. That information is fed into the computer and is retained, although in another form. Especially where, as here, the input data came from the defendants themselves rather than from an independent source, an objection based upon the absence of the original input data records is invalid.

■ It is also true that Exhibit 14 was merely cumulative of other evidence adduced by plaintiff from which the trial court was justified in finding, as it did, that the cattle sold by the defendants on July 9, 1977, were owned by Hollis. In November 1976 a veterinarian treated the cattle at the Copperhead Ranch. Hollis was present during the treatment. The records of the veterinarian showed that 133 Beefmaster cattle and 99 other cattle, also owned by Hollis, were at Copperhead Ranch at that time. Hollis testified that in July 1977 the number of Beefmaster cattle which he had at Copperhead Ranch was approximately 152 head [2] and that he also had 10 "commercial" calves. The defendants admitted that the 117 head of cattle which they sold on July 9, 1977, were rounded up at Copperhead. Examination of the voluminous records offered by both sides concerning the history of the herd between November 1976 and the sale in July 1977 shows that the trial court was justified in finding that the cattle involved in the July 1977 sale were those of Hollis and that none of the defendants had any property interest therein. Defendants' first point has no merit.

Defendants' second point is that the trial court erred in finding that Hollis's "117 head of cattle had a fair market value, on or about July 9, 1977, of $58,500," for the reason that the evidence will not support that valuation and for the additional reason that the value of the animals "at the time and place of their alleged conversion was established by their sale at auction."

As previously stated, the major factual war was fought over the issue of whether Hollis was the sole owner of the Beefmaster herd or whether Gary and Bobby were owners of half of it together with the offspring of that half.

■ After Hollis had offered testimony concerning the number of Beefmaster cattle which he had at Copperhead Ranch in July 1977, he testified that the cattle had a fair market value of $700 per head. In their brief defendants attack the weight of that testimony but, inasmuch as it was received without objection, the trial court was entitled to consider it.

■ Hollis also testified that the cattle on Copperhead Ranch in July 1977 consisted of 152 Beefmasters and 10 commercial calves. Although there was testimony that commercial cattle are worth less than Beefmaster cattle, even if the 10 commercial calves were among the 117 head of cattle sold on July 9, 1977, the trial court's award of $58,500 was within the range of the evidence.

■ Defendants argue that the value of the cattle was *established* by the price which they brought at the auction sale. That position is unsound. "[T]he amount received for property at a public auction, held under fair conditions, is some evidence, though not conclusive, of the value of the property converted at the time of the seizure." *Deer v. People's Bank of Springfield*, 47 S.W.2d 787, 788 (Mo.App.1932). Other authorities hold that when goods have been converted, proof of the price paid for them at an auction sale, although usually admissible, is not conclusive evidence of their value. *Dyer v. Rosenthal*, 45 Mich. 588, 8 N.W. 560 (1881); *White v. Pease*, 15 Utah 170, 49 P. 416 (1897); *Campbell v. Woodworth*, 20 N.Y. 499; *Citizens Nat. Bank v. Converse*, 105 Iowa 669, 75 N.W. 506 (1898); 18 Am.Jur.2d Conversion § 164, p. 253; 89 C.J.S. Trover & Conversion § 136, p. 626. Missouri appellate courts exercise

**2.** The evidence showed that prior to July 9, 1977, the defendants engaged in many cattle purchases and cattle sales. The petition alleged a conversion of 117 Beefmasters on July 9, 1977.

the power to set aside a judgment on the ground that it is against the weight of the evidence "with caution and with a firm belief that the . . . judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). This court has no such firm belief.

Defendants' second point has no merit.

■ Defendants' third point is that 3 of the 117 head of cattle involved in the July 9, 1977 sale were returned immediately to Hollis and that the value of those 3 animals should be credited against the judgment. Plaintiff's brief as respondent concedes, at least tacitly, that the 3 animals were restored to plaintiff and the brief states that plaintiff "agrees to a remittitur of the value of the 3 additional head." At the livestock auction the 3 animals sold for $1,275.90. The judgment of the trial court did not assign separate values to the 117 head but the award of $58,500, based on a sale of 117 head, constitutes an average of $500 per animal. Taking into consideration plaintiff's concession that the 3 head were restored, plaintiff's evidence that the cattle had an average value of $700 per head, and the auction price for which the 3 head were sold, this court modifies the judgment by reducing it by the amount of $1,500.

Defendants' fourth point is that the evidence concerning the conduct of Bob and Anny was insufficient to render them liable for the conversion of the cattle by Gary and Bobby.

Many years ago, in a conversion case, the Supreme Court of Missouri said: "In trespass all are principals, and those who direct a trespass, *or assent to a trespass for their benefit after it is done*, are equally liable to the action with those who actually commit it." (Emphasis added.) *Canifax v. Chapman & Wills*, 7 Mo. 175, 176–177 (1841). Other authorities hold that where goods have been converted, a defendant, who has knowledge of the conversion and who benefits by its proceeds, in whole or in part, is liable as a principal. *Hardie v. Peterson*, 86 Mont. 150, 282 P. 494 (1929); *Talich v. Marvel*, 115 Neb. 255, 212 N.W. 540 (1927); *Hooser v. G. M. Carlton Bros. & Co.*, 288

S.W. 1095 (Tex.Civ.App.1926); *Banks v. Windham*, 7 Ala.App. 616, 62 So. 297 (1913); *Evans v. State National Bank*, 24 F. 325 (C.C.La.1885); 18 Am.Jur.2d Conversion § 120, p. 231; 89 C.J.S. Trover & Conversion § 77, p. 575.

■ Gary and Bobby rounded up the cattle and sold them. Anny and Bob were living at Copperhead when those acts were done. Anny admitted that she learned in June that "the boys planned on selling all of the cattle." Bob admitted having knowledge of the roundup and sale. At the request of "the boys" Anny took the $18,721.72 check, representing the proceeds of 114 head, and obtained a cashier's check in replacement. Bob, aware that Hollis had instituted the attachment action, went to Arkansas where he cashed the cashier's check for an amount less than its face value. The proceeds of that check were used by Bob and Anny to pay for the land which Bob and Anny purchased from one Brotherton. The deed executed by Brotherton to Bob and Anny, as grantees, was signed by Brotherton on June 16, 1977, more than three weeks prior to the sale of the cattle. The deed was recorded on July 18, 1977. In Bob's deposition he said that he owned 2 of the 117 head which were sold. At the trial Bob's testimony was that he owned 62 of the 117 head.

The evidence is sufficient to show that Bob and Anny had knowledge of the conversion committed by Gary and Bobby and that Bob and Anny knowingly benefited by the proceeds of the conversion. Under the foregoing authorities the trial court properly found Bob and Anny liable, along with Gary and Bobby, for the conversion of the cattle.

■ Defendants' fifth point is that the trial court erred in finding that no partnership existed between plaintiff, on the one hand, and Bob, Gary and Bobby on the other. Defendants argue that the weight of the evidence shows that the parties did enter into a partnership. In advancing this point defendants rely upon their version of the arrangements with Hollis pertaining to

the care and breeding of the 40 Beefmaster heifers. The trial court rejected defendants' version and properly so.

Plaintiff's version of the arrangements received support from two witnesses who are full brothers of Bob. The trial testimony of each of the defendants was strongly impeached by their respective depositions. Documents signed by Gary and Bobby were inconsistent with their contention that each of them owned 10 of the 40 heifers. The evidence upon which defendants base their contention that a partnership existed was contradicted by plaintiff's evidence which the trial court could and did believe. Defendants' fifth point has no merit.

Defendants' sixth point is that the trial court erred in making a finding of fact to the effect that Bob had been fully paid all wages and reimbursed for all his expenses. In support of this point defendants refer to a letter written by Hollis to Bob on May 29, 1977, in which Hollis said, "I am willing to reimburse you for any out-of-pocket expenses you *might* have had on the ranch." The letter was written prior to the conversion of the cattle. Defendants seek to accord the statement more weight than it deserves. The trial court heard lengthy testimony concerning the arrangement between the parties and the history of the cattle operations on Copperhead Ranch over several years. The trial court's findings do not lack evidentiary support.

The judgment is modified by reducing it from $58,500 to the sum of $57,000. As so modified the judgment is affirmed.

TITUS, GREENE and PREWITT, JJ., concur.

HOGAN, J., disqualified.