KAROHL, Presiding Judge.
 

 Defendant appeals judgment for plaintiff rendered on November 16, 1984, after jury trial in the Circuit Court of Montgomery County. Plaintiff Fricke claimed below that Valley Production Credit Agency (VPCA) had converted his cattle when it repossessed cattle from its borrower-debt- or, Robert Hartman, and sold these cattle at auction. VPCA filed a counterclaim asserting its right to proceeds of other cattle sales under its perfected security interest -in- Hartman’s cattle. The jury found for Fricke on his claim and on VPCA’s counterclaim, awarding Fricke $98,000. We reverse and remand.
 

 BACKGROUND:
 

 VPCA is a production credit association established by Congress as part of the farm credit system. It functions as a bank and is privately owned by the farmers who borrow from it. Robert Hartman was one of these farmers borrowing from VPCA. Hartman had a line of credit at VPCA upon which he drew using sight drafts. He used its funds as operating loans for several farms in the area, including four used primarily for cattle. By September, 1981, Hartman was $900,000 in debt to VPCA under promissory notes, a security agreement, its amendments and properly filed financing statements. The security agreement and amendments covered, among other farming assets, “all cattle and all farm livestock.” It also covered “All additions, acquisitions, replacements, substitutions of collateral described in this Section 2 and any and all property of similar type and kind now owned or hereafter acquired by debtor ...” As Hartman purchased additional cattle, amendments were added to reflect the size, type and number of the new purchases. There is no dispute that VPCA’s security interest in all of Hartman’s cattle was current and perfected throughout the events here at issue.
 

 Sometime in September, 1981, Hartman and Fricke agreed to buy and sell cattle
 
 *749
 
 together. There were two agreements drafted to define this business relationship. The first, dated September 14 and signed by Hartman alone, was written by Fricke or his wife following a meeting between the two men and stated in part:
 

 “William E. Fricke is to furnish the capital needed to carry on the business expense but not to exceed $75,000.00 which will be secured by a deed of trust and a non-interest bearing note of $75,000.00 given by Robert D. Hartman and Barbara F. Hartman.
 

 Fricke testified that he intended this document only to outline the basic understanding between himself and Hartman, and also stated that he considered it unnecessary for Hartman to give him a deed of trust because he thought his security lay in the cattle. Hartman gave the deed of trust as evidence of his good faith, according to Fricke. Fricke did, however, record the deed. Fricke denied this was a partner or joint venture agreement but acknowledged that he was to divide the profits with Hartman “at the end of the operation.”
 

 The second agreement was also dated September 14, 1981, although it was drafted in November by O.J. Mundwiller, Fricke’s attorney. It was drafted in November 1981 and back dated to the date of the first agreement. The parties executed this contract in late November. The agreement stated that Hartman was the employee of Fricke, would receive a salary of $7 a head after sale, would split sale profits with Fricke and that Fricke would be the owner of the cattle.
 

 TRANSACTIONS:
 

 All the cattle purchases and sales by Fricke and Hartman took place between September 11 and October 8, 1981. All purchases occurred before the second agreement. Each cattle purchase except the last one was funded by direct sight draft on VPCA or by check drawn on a Hartman Farms account funded by deposits from the VPCA line of credit.
 

 The first cattle purchase was for-149 head on September 11 and 12 from TriState and Farmer’s Livestock Markets. This was before the first agreement. The sale invoice read “sold to RH.” Hartman paid for these cattle by checks drawn on Hartman Farms, for which Fricke reimbursed him by two checks dated September 14 totalling $46,496.32. Fricke also reimbursed Hartman for trucking and insurance costs of $1,294.40, but directly paid a trucking bill for $1,336.20. Farmer’s Livestock Market later corrected a math error in Fricke’s favor by remitting $3,966.82 by check dated September 15. This check was made payable to Hartman and he endorsed it to Fricke.
 

 The men then co-signed as sellers for 59 head at Callaway Stock Sales although the exact date and selling price are unclear in the record. Fricke reimbursed Hartman for handling fees of $413.00 by check dated September 17.
 

 The second purchase was for 71 head at the Jonesboro Livestock Market on September 14. The two invoices were marked “sold to RH.” Hartman paid for these cattle by VPCA sight draft for $25,343.39. Fricke reimbursed Hartman by checks for the purchase price with additional transport, insurance and feeding costs of $1,595.95.
 

 There was a second sale of cattle on September 15, when Fricke and Hartman co-signed as sellers of 29 head. The record does not indicate the proceeds.
 

 On September 18, there was a third purchase of 78 head for $15,977.18. The three invoices were marked “sold to RH.” Hartman drew a VPCA sight draft dated September 24 payable to his employee, Roland Linneman, who apparently purchased the cattle as agent at the market for $15,-977.18. Fricke reimbursed Hartman for this purchase sum by check dated September 22 and also on that date paid him $135 for feed of 5 head lost off the transport truck. These 5 cattle were not recovered.
 

 The fourth and final purchase was of 187 head at Tri-State Live Stock Market on September 25. The invoice read “Sold to RH” and the total purchase price, accord
 
 *750
 
 ing to the record, was $38,175.35. Hartman paid for the 187 head from his own account and Fricke reimbursed him by three separate checks for $10,000 on September 29, $12,115.34 on October 6 and $2,990.87 on October 8. These checks total $25,106.21. Hartman’s original purchase check bounced and the seller repossessed 175 head plus $2,000 (or $3,000) to cover the difference. To raise additional funds for this fourth purchase, Fricke and Hartman had to sell 87 cattle and use sale proceeds because Fricke’s original $75,000 investment was depleted. Because Fricke reimbursed Hartman for $25,106.21 of the $38,175.35 total price, the sale proceeds for 87 head seem to be $13,069.14 although the record before us is silent. These 87 cattle were shipped to Texas for sale on October 7.
 

 Additional sales took place during the first week of October. On October 2, the men sold 64 head for $12,337.84 and on October 6, they sold 19 head for $2,990.87.
 
 [1]
 

 Trial testimony indicates that a certain death loss is to be expected when raising cattle but no actual figures are available to show what death loss occurred in this herd. Roland Linneman, who lived at the Gleeson farm and cared for the cattle, estimated this loss at 2 to 5 percent at most.
 

 COURSE OF DEALING:
 

 Hartman hit on a cattle selling plan while travelling in the mid-Atlantic states during 1981. He noticed cattle prices seemed to be lower in that region than in Missouri so he planned to purchase blocks of cattle in Virginia and Maryland for immediate resale in Missouri. Needing money, Hartman met with Fricke in September of 1981 and they began purchases under the first agreement discussed above. Fricke had borrowed his $75,000 investment from People’s Savings Bank and, at the close of the two weeks of cattle purchases and sales, all was spent. During the purchases and sales, Fricke never went to the livestock markets or made any direct cattle purchases. Instead, Hartman would purchase the cattle at market with his name on the sale invoice, present the invoice to Fricke as proof of purchase and receive Fricke’s check in reimbursement. Hartman also paid trucking costs and took out insurance naming himself as beneficiary. Fricke also reimbursed him for these costs.
 

 Occasionally, Roland Linneman would purchase cattle as agent for Hartman. Linneman lived on the Gleeson farm and worked for Hartman. He testified that he had no dealings with Fricke in 1981 and took no instructions from him. Linneman represented himself at auction as dealing for Hartman, and had no information that Fricke was involved in any of the cattle on the Gleeson farm prior to October, 1981.
 

 Hartman had much discretion in making purchases and sales. Fricke only went up to Hartman’s Gleeson Farm to count cattle or to review how Hartman was handling the situation. Fricke could only recall two occasions when he even helped select any cattle to be sold. He did not consider himself “a cattle man” and relied on Hartman’s expertise to make purchase or sale decisions.
 

 Fricke did not know exactly how the cattle were pastured but thought they were unloaded into a lot on the Gleeson Farm and then moved to a southern pasture where they were left free to roam. Hartman, by deposition, agreed and stated that the cattle were eventually commingled with his own. Fricke was not personally aware of any distinguishing marks on the disputed cattle, although Hartman stated by deposition that his cattle had an unregistered “BH” brand to distinguish them from the cattle at issue and that some of these cattle were marked by notched ear.
 

 
 *751
 
 During the fourth and final series of purchases, 175 head of cattle were repossessed when Hartman’s personal check was returned for insufficient funds. Chester Baker, on behalf of the livestock, market, loaded 175 head from the Gleeson Farm and took them to Texas, sold them and then collected $2,000 (or $3,000) from Hartman to remedy the deficiency in sale proceeds. Linneman testified that Baker arrived at sundown and just loaded up two trucks without making any effort to get any certain mixture of steers, bulls and heifers. Chester Baker selected which cattle were loaded based on auction tags still glued to their rumps, but Linneman testified that these tags are temporary and unlikely to remain on the rump during transit or outside in weather. Fricke knew no details of this repossession.
 

 After these purchases and sales were completed, it became clear to Fricke and Hartman that they were losing money so they decided to change their approach. Instead of selling the cattle within a matter of days as originally planned, they decided to pasture the cattle at the Gleeson Farm until spring in hopes of higher selling prices. For this reason, Fricke explained, they went to Attorney O.J. Mundwiller so that he might redraft their original agreement. Although they signed the new contract near Thanksgiving after all purchases and sales at issue were completed, the agreement was antedated to September 14, 1981.
 

 VPCA was authorized to and did inventory Hartman’s property on several occasions. Most of these inventories were casual estimates. Walter Els, loan officer for VPCA, testified there were no cattle at the Gleeson Place on August 3. VPCA estimated 500 to 600 head of cattle on September 30, 189 head on October 15, and 165 head on November 5. Mr. Els testified that Hartman twice indicated the cattle were his, on September 30 and November 5. VPCA visited the Gleeson farm five more times in November after becoming aware that all Hartman’s cattle listed on the security agreement amendments were not accounted for and made a full inventory on December 10, 1981. The inventory revealed 95 head weighing approximately 750 pounds in the unloading lot and 92 head weighing approximately 500 pounds in the pasture to total 187 pastured at Gleeson. VPCA also noted 134 head at another Hartman cattle farm. They had expected to find approximately 850 head, but could only find approximately 315 head.
 

 In late December, VPCA rounded up all cattle claimed by Hartman and stored them at the Gleeson Farm. Larry Graves, a VPCA employee, testified that an extra 149 head were added on December 22 to the 187 head already pastured at Gleeson.
 

 On January 7, 1982, all the feeder-type cattle (317 head) pastured at Gleeson were sold at the National Stockyards in East St. Louis for $76,434.86. Fricke’s attorney Mundwiller testified that this is a major regional center and the prices obtained at this auction fairly represent the market at that time. The record discloses no evidence of separate prices and weights for each animal sold. Apparently, the cows and calves were sold later for an undisclosed price, although Graves’ testimony mentioned that some calves were sold for as little as $5.50 a head. Larry Graves testified that, after the proceeds were applied to Hartman’s loan, the outstanding balance remains at approximately $970,000.
 

 As had VPCA, Fricke had also been visiting the Gleeson farm and counting cattle. He testified that he went to the Gleeson farm with his two sons to count cattle on December 30 or 31, 1981. He counted 310 head. After leaving the farm, Fricke met Larry Graves and told him that he suspected his cattle were intermingled with others because he counted more than anticipated. Graves refused to speak about the matter. Fricke met with Hartman on January 3, 1982, and observed two loads of cattle being transported south on Route 19. Hartman told Fricke that the cattle looked like the cattle on the Gleeson farm. Fricke became concerned and spoke with his attorney, O.J. Mundwiller, who wrote two letters to Larry Graves which informed
 
 *752
 
 VPCA of Fricke’s claims. VPCA received these letters before the January 7 cattle sale.
 

 Fricke brought this suit after VPCA repossessed and sold the cattle, claiming the cattle were his and wrongfully converted by VPCA when sold at auction. VPCA ' cross-claimed for proceeds stemming from the earlier sales of cattle in which they claimed a perfected security interest.
 

 POINTS ON APPEAL:
 

 First, defendant VPCA argues the trial court erred in failing to direct a verdict for VPCA because plaintiff Fricke failed to establish an ownership right or interest superior to that of VPCA. VPCA claims that it had a valid, enforceable and perfected first priority security agreement covering all of Hartman’s cattle, and that Hartman acquired sufficient interest in the cattle for VPCA’s rights to attach.
 

 Second, VPCA urges court error in failing to direct a verdict in its favor or failing to award a judgment notwithstanding the verdict or a new trial because Fricke failed to introduce evidence reasonably identifying which cattle were allegedly converted, and failing to show by a preponderance of the evidence that the cattle he claimed were those allegedly converted.
 

 Third, VPCA avers trial court error in failing to direct a verdict in its favor, award a judgment n.o.v. or a new trial on damages because plaintiff failed to show by sufficient evidence the fair market value of the cattle at issue.
 

 Fourth, VPCA finds error in failing to grant a new trial on damages because those awarded were excessive and against the weight of the evidence.
 

 Fifth, VPCA asserts it was error to admit evidence over objection of unregistered cattle brands.
 
 See
 
 § 268.031 RSMo 1978.
 

 Sixth, VPCA claims error in failing to direct a verdict for it on its counterclaim against Fricke because VPCA had proven its right to the disputed cattle or their proceeds.
 

 Last, VPCA proffered its Instruction C which it contends was erroneously refused in that the jury was not properly instructed on VPCA’s theory of security interest attachment.
 

 DISCUSSION:
 

 We find VPCA’s first and sixth arguments decisive and hold that VPCA is entitled to a directed verdict because Hartman had sufficient interest in the cattle, as a matter of law, for VPCA’s security interest in those cattle to attach. Thus, VPCA is also entitled to a directed verdict on the issue of liability on their counterclaim against Fricke for proceeds of cattle sold by Fricke and Hartman.
 

 Appellate courts do not hear or weigh evidence but merely provide an opportunity to examine asserted error in the trial court which is of such a nature that the complaining party is entitled to a new trial or outright reversal or some modification of the judgment entered.
 
 Thummel v. King,
 
 570 S.W.2d 679, 686 (Mo.banc 1978). We review denial of a motion for directed verdict as a question of law, viewed in the evidentiary light most favorable to the non-moving party, and determine whether that party has made a submissible case.
 
 Wessler v. Wessler,
 
 610 S.W.2d 650 (Mo.App.1980) and
 
 Green v. Crunden Martin Mfg. Co.,
 
 575 S.W.2d 930 (Mo.App.1978). We review Fricke’s evidence and find, as a matter of law, that Hartman had sufficient rights in the cattle for VPCA’s security interest to attach. § 400.9-204(1) RSMo 1978.
 

 Fricke and Hartman had an understanding that they would enter a cattle operation together and, after they met, Fricke drafted a sketchy contract to reflect this understanding. This first document was dated September 14, 1981, and must govern the cattle transactions here at issue. This agreement did not specifically define the parties’ relationship but seemed to create a joint venture. Hartman was to buy the cattle. Fricke was to provide up to $75,000.00. The men were to split the profits.
 

 
 *753
 
 The second contract which characterized Hartman as Fricke’s “employee” was not drafted until November; the new contract was not in effect until long after the purchases and sales were completed. In relation to the third parties it cannot purport to govern. Nor can the second contract purport to define the parties’ relationship during a series of transactions already completed. The fact that the second contract, although drafted in November, was dated September 14 makes its contents self-serving statements about purchases and sales already completed.
 

 Further, the parties’ course of dealing makes it clear that Hartman had sufficient interest in the cattle for VPCA’s rights to attach. It is undisputed that Hartman paid for the cattle using funds derived from VPCA. He purchased the cattle in his own name. The sellers delivered and invoiced the cattle to Hartman. He received possession of the cattle after delivery. He insured the cattle in his own name. He used VPCA money to pay for the cattle. Finally, Hartman’s employee Roland Linneman was authorized to purchase cattle for Hartman without knowing of Fricke’s involvement.
 

 Under the Uniform Commercial Code, such facts as a matter of law vested in Hartman an interest in the cattle. VPCA’s security interest attaches when there is an agreement that it attach, when value is given and when Hartman had rights in the collateral. § 400.9-204(1) RSMo 1978. The parties do not dispute that VPCA had a valid, enforceable and first priority security interest which covered all the cattle and their proceeds on the Gleeson farm. Instead, Fricke argues Hartman had no rights in the cattle because he, Fricke, owned them “from the word ‘go’ ” and so the U.C.C. provisions are not applicable.
 

 With this we cannot agree. Fricke’s contention of his ownership is simply irrelevant under the Code. “Each provision of this article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or the debtor.” § 400.9-202 RSMo 1978. “Title” is not the relevant concern where the parties’ rights are governed by Article Nine of the Code; the issue is whether the debtor has acquired sufficient rights in the collateral so that the security interest would attach. On this issue the U.C.C. changed prior Missouri law.
 

 Missouri law has not yet determined when an Article Nine debtor would acquire such rights in collateral as to attach a security interest. There are many cases decided elsewhere, however, which interpret provisions identical to those adopted in Missouri. We note that two of the purposes behind the U.C.C. as adopted in Missouri are: “(a) to simplify, clarify and modernize the law governing commercial transactions;” and “(c) to make uniform the law among the various jurisdictions.” § 400.1-102(2)(a) and (c) RSMo 1978.
 

 This question has been discussed where the dispute arises between an unpaid cash seller and the purchaser’s secured party who has seized the purchased collateral under a valid security interest.
 
 Matter of Samuels & Co., Inc.,
 
 526 F.2d 1238 (5th Cir.1976), decides the dispute in favor of the secured creditor. There the debtor paid for cattle with a check, later returned for insufficient funds, and took delivery of the cattle. The debtor’s secured party then seized the cattle under the terms of the security agreement after debtor defaulted and the unpaid cash seller sued the secured party. As in our case, the secured party concededly held a perfected Article Nine security interest which extended to the livestock claimed by the plaintiff.
 

 The court held that the defaulting buyer acquired sufficient rights in the cattle to allow the creditor’s lien to attach.
 
 Sam-uels,
 
 526 F.2d at 1242. The court reasoned that purchasers can take from a defaulting cash buyer, § 2-403(1) and § 2-401(1) and lien creditors are included as “purchasers” under § 1-201(32) and (33). Further, a lien is an Article Nine interest. § 9-102 and Comments. Thus:
 

 The Code anticipates a situation where the interest of an unpaid cash seller who has delivered goods to a breaching buyer
 
 *754
 
 is subordinated to the interest of “purchasers” of the buyer. Lien creditors are included in the definition of “purchasers;” in order that there
 
 be
 
 lien creditors, the buyer’s interest must be great enough to allow attachment. Therefore, however, Samuels’ [the debtor’s] interest upon delivery of the cattle is defined,
 
 and however slight or tenuous or marginal it was, it was necessarily great enough to permit attachment of a lien, including C.I.T.
 
 ⅛
 
 Article Nine interest.
 
 * * * * * *
 

 Upon non-payment, Samuels lost the right to retain or dispose of the property, but the Code recognizes that the breaching buyer had the power to encumber, despite non-payment, so long as he retained possession. §§ 2.403(a); 1.201(32)(33). In the instant case, this power arose as a result of Stowers’ delivery, and it did not terminate while the goods remained in Samuel’s hands. The whole point of Article Nine is the continuity of perfected security interests
 
 once they have properly attached,
 
 despite subsequent loss of control or possession of the collateral by the debtor. § 9.201. (emphasis ours).
 

 Samuels,
 
 526 F.2d at 1247.
 

 The court also discusses the effect of title, noting that the U.C.C. specifically limits the seller’s ability to reserve title by permitting him to reserve only a security interest in the collateral once he has voluntarily surrendered possession to the buyer. § 2-401(a). Additional sections of the Code as adopted in Missouri and elsewhere, show that location of title does not determine the respective rights of the parties under U.C.C. §§ 400.2-401 and 400.9-202 RSMo 1978.
 

 The analysis in
 
 Samuels
 
 has been supported by many cases.
 
 See AMFAC Mortgage Corp. v. Arizona Mall of Tempe, Inc.,
 
 618 P.2d 240 (Ariz.App.1980);
 
 Fisher v. First National Bank of Memphis,
 
 584 S.W.2d 515 (Texas App.1979);
 
 In re County Green Limited Partnership,
 
 438 F.Supp. 693 (W.D.Va.1977);
 
 Mortion Booth Co. v. Tiara Furniture, Inc.,
 
 564 P.2d 210 (Okla.1977);
 
 United States v. Wyoming National Bank of Casper,
 
 505 F.2d 1064 (10th Cir.1974); and
 
 First National Bank of Elkhart County v. Smoker,
 
 11 U.C.C.Rptr. 10 (Indiana App.1972).
 

 Although these cases decide the dispute as between the secured creditor and the unpaid cash seller, the principles articulated are equally applicable to the present case which involves a dispute between the secured party and a co-investor or principal of the debtor. This is so because the unpaid seller would at least reserve a security interest under § 400.2-401 RSMo 1978, where a co-investor with the debtor would logically share in the debtor’s interest and be subordinate to any interest asserted by the unpaid seller. Here Hartman had a profit interest in the cattle according to Fricke’s description of the first agreement.
 

 A case very similar to ours is
 
 Poteet v. Winter Garden Production Credit Association,
 
 546 S.W.2d 650 (Texas App.1977).
 
 Poteet
 
 involved a contest between a creditor (Winter Garden) claiming an interest in debtor’s after-acquired property and Po-teet, who claims ownership of property because the debtor, as his agent, purchased it for him. The debtor, Wooton, operated a cattle feed lot where he fed out cattle for himself and many others. Winter Garden was Wooton’s creditor and had a properly perfected security interest in all of Woo-ton’s livestock and in the “proceeds thereof.” Poteet had his cattle fed out at Woo-ton’s. Wooton and Poteet had an arrangement where Wooton would find cattle and buy them, paying for them himself with his own funds or money borrowed from Winter Garden Credit. Wooton then put the cattle in a pen, branded them as Poteet’s, notified or invoiced Poteet and was reimbursed by Poteet for the purchase price. He would then fatten the cattle for some days, sell them and remit the proceeds to Poteet. Wooton’s only charge was for the feeding; he received no portion of the sale profits.
 

 The trial court entered judgment in favor of Winter Park and, although no findings of fact were requested or filed, on appeal the court affirmed after presuming a find
 
 *755
 
 ing in support of the judgment that the debtor Wooton had acquired sufficient interest in the cattle to support attachment of Winter Garden’s security interest.
 
 Po-teet,
 
 546 S.W.2d at 652. The appellate court noted that the result in Poteet was proper under its facts in that its facts were more favorable to the secured creditor than those of
 
 In re Samuels & Co., Inc. Poteet,
 
 546 S.W.2d at 653.
 

 The purposes of the Code can be achieved only by enforcing its provisions, and a party who chooses to ignore state law must take a calculated risk that loss will result. Here Fricke need only have searched for VPCA’s financing statement, properly filed in Montgomery City, to discover VPCA’s security interest in cattle purchased by Hartman and in which he had at least a profit interest. Fricke could have structured his subsequent dealings with Hartman to avoid loss by furnishing funds for Hartman to use for purchases, directing purchases be made in Fricke’s name, and segregating the cattle so purchased from Hartman’s other cattle.
 
 See First National Bank & Trust Co. of Norman, Oklahoma v. Jim Payne Pontiac GMC Inc.,
 
 20 U.C.C.Rep. 768 (Okla.App.1976).
 

 Our result is also supported by principles of agency law. Hartman never disclosed Fricke’s name, but usually purchased in his own name alone and only occasionally disclosed that he had a “partner.” Where the agent does not disclose, or only partially discloses his agency, both the agent and principal are liable on the contract.
 
 See Hamilton Music, Inc. v. Gordon A. Gundaker Real Estate Co., Inc.,
 
 666 S.W.2d 840, 845-846 (Mo.App.1984). Hartman was liable for his insufficient funds check on the one stock purchase which resulted in a repossession.
 

 Fricke’s own evidence shows that Hartman’s name or that of his farm appeared on all the purchase invoices. Linneman had no knowledge of Fricke’s involvement and acted only as agent for Hartman. Hartman always purchased the cattle using a VPCA sight draft or a check drawn on Hartman Farms. Fricke can be no more than an undisclosed principal and Hartman would acquire rights in the purchase contract sufficient to cause VPCA’s security interest to attach.
 
 See In re Crouthamel Potato Chip Co., Inc.,
 
 30 U.C.C.Rep. 346 (E.D.Pa.1980).
 

 We reverse and remand for judgment
 
 for
 
 defendant VPCA on plaintiff’s petition and judgment in an amount determined by the trial court on defendant’s counterclaim.
 

 SIMON and GARY M. GAERTNER, JJ., concur.
 

 [1]
 

 . It appears that, after the sale of 19 head of cattle, the dispute on Fricke’s petition involves no more than 47 head. The purchases total 485 head. Sales total 258. Five head were lost off a transport truck and 175 head were repossessed. The remaining cattle, without any death losses, total 47. Based on the record we can determine that the average price paid per head by Hartman and Fricke is $262.84.