**William E. FRICKE, Respondent,**

v.

**VALLEY PRODUCTION CREDIT ASSOCIATION, Appellant.**

**No. 55363.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 12, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 10, 1989.

Application to Transfer Denied
Nov. 14, 1989.

---

Walter D. McQuie, Jr., Montgomery City, for respondent.

Garry McCubbin, Mark G. Arnold, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, St. Louis, for appellant.

SIMON, Chief Judge.

Appellant, Valley Production Credit Association (VPCA), appeals from a summary judgment entered against respondent, William E. Fricke (Fricke), on VPCA's petition for damages for conversion of cattle and the proceeds of the sales of cattle covered by its perfected security interest. This is the second appeal of this case.

In the previous appeal, *Fricke v. Valley Production Credit Association*, 721 S.W.2d 747 (Mo.App.1986) (*Fricke I*), we held that VPCA was entitled to a directed verdict on its counterclaim for conversion against Fricke and remanded for a determination by the trial court of damages on VPCA's counterclaim. On remand the trial court, in ruling on VPCA's motion for summary judgment, found that VPCA was damaged in the amount of one dollar and entered judgment accordingly.

On appeal, VPCA contends that the trial court erred in entering its order of summary judgment in favor of VPCA with damages of one dollar because VPCA was entitled to judgment in the amount of $59,387.63, plus prejudgment interest. We reverse and remand with direction to the trial court to enter judgment in accordance with this opinion.

The record reveals the following facts viewed in the light most favorable to Fricke, the party against whom the motion for summary judgment was . filed. The facts of the underlying conversion action are set forth in detail in *Fricke I*. Therefore, only those facts pertinent to this issue on appeal will be set forth below.

In September, 1981, Robert Hartman, who is not a party to this appeal, and William Fricke entered into an agreement to split the profits from an operation involving the purchase and sale of cattle. Under the arrangement, Hartman would purchase cattle in his name using sight drafts to draw on his line of credit at VPCA. Hartman would present the sale

invoices to Fricke and be reimbursed for the cattle purchases. Hartman was also responsible for the cattle sales.

This business relationship was evidenced by two written agreements, one drafted in September and the other in November, which set forth the arrangements made for financing the operation and Hartman's role in carrying out the operation, respectively. Fricke borrowed $75,000.00 from People's Savings Bank to provide the capital needed to make the cattle purchases.

At the time of the first agreement, Hartman had a line of credit at VPCA to finance operations at his various farms and was $900,000.00 in debt to VPCA. This debt was secured by a security agreement, its amendments and properly filed financing statements. The security agreement and amendments covered, among other farm products, "all cattle and all farm livestock." It also covered "All additions, acquisitions, replacements, and substitutions of Collateral described in this section 2 and any and all property of similar type or kind now owned or hereafter acquired by the Debtor ... and all cash and non-cash proceeds from the sale, exchange, collection, or other disposition of any of said goods and property,...."

As Hartman purchased additional cattle, amendments were added to reflect the age, type and number of the new purchases. There is no dispute that VPCA's security interest in all of Hartman's cattle was current and perfected throughout the time of the Fricke–Hartman agreements.

Our opinion in *Fricke I* clearly sets forth the transactions that took place as a result of the Fricke–Hartman agreements. 721 S.W.2d at 749–50. There were a total of four purchases and five sales between September 11 and October 8, 1981. The first cattle purchase was on September 11 and 12 of 149 head for $46,496.32. The second cattle purchase was for 71 head on September 14, for $25,343.36. The third and fourth purchases were of 78 and 187 head on September 19 for $15,977.18 and September 25 for $38,175.34, respectively. Hartman was the purchaser on each of these transactions, except for the third purchase of September 19, when Roland Linneman purchased the cattle as Hartman's agent. The cattle from these four purchases were unloaded onto one of Hartman's properties, Gleeson Farm, and eventually commingled with Hartman's own cattle which were subject to VPCA's security interest.

The current appeal centers on the proceeds received from the five sales of cattle taken from those commingled on Gleeson Farm. The first sale of cattle was of 59 head on September 14, for $15,498.55. The second sale of 29 head occurred on September 15, and was for $9,378.09. A third sale of 66 head occurred on October 2 for $12,337.84. Nineteen head were sold on October 6 for $2,990.87. A fifth and final sale took place in Texas on October 7 when 87 head were sold for $19,182.28 to raise additional funds to pay for the fourth purchase of 187 head of cattle that had taken place on September 25.

The proceeds of the first four cattle sales were deposited in Fricke's account at People's Savings Bank. This account functioned as a business operating account out of which Hartman was reimbursed for the cattle purchases and costs. The proceeds of the first two sales were deposited into the account on September 18. The total deposited was $28,843.46 which included $3,966.82 which was the amount returned due to a mathematical error that resulted in an overpayment on the first cattle purchase. The second deposit occurred on October 6 and was for the amount of the third sale, $12,337.84. The proceeds of the fourth sale, $2,990.87, were deposited on October 8.

The proceeds of the fifth and final sale of cattle in Texas, $19,182.28, were retained by Hartman because of the outstanding debt that Fricke owed on the fourth purchase of 187 head and to reimburse Hartman for other expenses incurred.

During the various purchases and sales, VPCA inventoried Hartman's properties on several occasions. On December 19, 1981, VPCA made a full inventory after becoming aware that all of Hartman's cattle list-

ed on the security agreement amendments were not accounted for. They expected to find approximately 850 head, but only found 187 pastured at Gleeson Farm and 134 head at another Hartman property.

In late December, as a result of the inventory, VPCA rounded up all of Hartman's cattle and stored them at Gleeson Farm. On January 7, 1982, 317 head of cattle were sold at the National Stockyards in East St. Louis for $76,434.86. After the proceeds of this sale were applied to Hartman's debt, the outstanding balance was approximately $970,000.00.

Fricke brought suit after the repossession claiming that the cattle at Gleeson Farm were his and VPCA had wrongfully converted them. VPCA cross-claimed for the proceeds of the earlier cattle sales in which it claimed a perfected security interest. In the first trial, the jury found for Fricke on his conversion claim and against VPCA on its counterclaim.

On appeal in *Fricke I*, VPCA argued that "it had a valid, enforceable and perfected first priority security agreement covering all of Hartman's cattle, and that Hartman acquired sufficient interest in the cattle for VPCA's rights to attach." 721 S.W.2d at 752. VPCA also claimed error for failure "to direct a verdict for it on its counterclaim against Fricke because VPCA had proven its right to the disputed cattle or their proceeds." *Id.*

In *Fricke I*, we stated:

We ... hold that VPCA is entitled to a directed verdict because Hartman had sufficient interest in the cattle, as a matter of law, for VPCA's security interest in those cattle to attach. Thus, VPCA is also entitled to a directed verdict on the *issue of liability on their counterclaim against Fricke for proceeds of cattle sold by Fricke and Hartman.* (Emphasis ours). 721 S.W.2d at 752.

We concluded by reversing and remanding "for judgment for defendant VPCA on plaintiff's petition and judgment in an amount determined by the trial court on defendant's counterclaim." *Id.* at 755[5, 6].

On remand, VPCA filed a motion for summary judgment asking for damages of $59,387.63, which equaled the amount of the proceeds derived from the sales of the converted cattle. The trial court entered judgment for VPCA in the amount of one dollar. In an accompanying memorandum to the parties, the trial court set forth several theories to support its award of nominal damages:

1. VPCA's course of dealing with Hartman, in that he was not required to remit the proceeds of all sales to VPCA, resulted in "a waiver on the part of VPCA and cut off any security interest previously acquired once the cattle were disposed of by Hartman."

2. VPCA's security interest in the proceeds remained in the reimbursement payments made to Hartman by Fricke, rather than the full amount Fricke received from each sale.

3. VPCA's loss resulted from "the gross negligence of VPCA not only in failing to supervise Hartman's farming operation but in acquiescing in his unrestricted dealing in secured property."

VPCA argues that this court's prior opinion in *Fricke I* held that Fricke was liable to VPCA for all cattle sold by Hartman and Fricke or the proceeds thereof.

Initially, we note that in reviewing the granting of a motion for summary judgment:

[W]e must scrutinize the record in the light most favorable to the party against whom the motion was filed, and accord to that party the benefit of every doubt. To support a summary judgment, the pleadings, depositions and admissions on file, along with any affidavits must make it manifest that there is no genuine issue of material fact. Rule 74.04(c). If there is the slightest doubt as to the facts then a genuine issue of fact exists for purposes of Rule 74.04(c), and summary judgment should not be entered.

*Hawes v. O.K. Vacuum & Janitor Supply,* 762 S.W.2d 865, 867 (Mo.App.1989).

The issue raised on appeal is governed by U.C.C. § 9–306(2) which provides:

[A] security interest continues in collateral notwithstanding sale, exchange or

other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and *also continues in any identifiable proceeds* including collections received by the debtor. (Emphasis added).

§ 400.9–306(2) RSMo 1978.

Official comment 3 to this section of the U.C.C. states:

In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or *in an appropriate case maintain an action for conversion. Subsection (2) codifies this rule.* (Emphasis added).

§ 400.9–306, Comment 3 RSMo 1978.

Our research has not found, nor have the parties pointed us to a decision in Missouri on this proposition. We note, however, that two purposes behind the U.C.C. as adopted in Missouri are: "(a) to simplify, clarify and modernize the law governing commercial transactions;" and "(c) to make uniform the law among the various jurisdictions." § 400.1–102(2)(a) and (c) RSMo 1978; *Fricke I*, 721 S.W.2d at 753[4]. Therefore, we look to other jurisdictions and find persuasive the Tennessee Court of Appeals' statement, referring to U.C.C. § 9–306(2), that where an unauthorized disposition of collateral is made, such disposition constitutes a default and the secured party has a valid action in conversion. *Mammoth Cave Production Credit Assn. v. Oldham*, 569 S.W.2d 833, 837[3] (1977) This has been cited with approval in *ITT Industrial Credit Co. v. H & K Machine Service Co.*, 525 F.Supp. 170, 171[1–4] (E.D.Mo.1981).

"Conversion is the unauthorized assumption of the right of a ownership over the personal property of another to the exclusion of the owner's rights." *Maples v. United Savings and Loan Ass'n*, 686 S.W.2d 525, 527[1] (Mo.App.1985). An ac-

tion for conversion can be had against any of the transferees of the collateral so converted. *Ceres Fertilizer, Inc. v. Beekman*, 209 Neb. 447, 308 N.W.2d 347, 350[4] (1981). "A secured creditor does not have to proceed against the debtor before suing a converter." *Polk County Bank v. Spitz*, 690 S.W.2d 192, 195[10] (Mo.App.1985).

However, where the secured party has authorized, impliedly or otherwise, disposition of the collateral, an action for conversion will not lie against a transferee. § 400.9–306(2) RSMo 1978; *Charterbank Butler v. Central Cooperative*, 667 S.W.2d 463, 465[2] (Mo.App.1984). Such authorization constitutes a waiver of the secured party's rights in the collateral. *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726, 732[7, 8] (1967).

■ In the present case, the trial court on remand considered the issue of waiver in its award of nominal damages to VPCA and found that VPCA's course of dealing resulted in a waiver which cut off VPCA's security interest. The trial court should not have considered this question as our prior opinion in *Fricke I* addressed this in deciding the issue of conversion of the cattle proceeds.

In *Fricke I*, we held that VPCA was entitled to a directed verdict on its counterclaim of conversion against Fricke for the proceeds of the cattle sold. 721 S.W.2d at 752. "Whenever an appellate court reverses and remands the judgment of a trial court, the appellate court does so with directions which are determined from the mandate and opinion of the appellate court." *Brooks v. Kunz*, 637 S.W.2d 135, 137[2] (Mo.App.1982). In *Fricke I*, we reversed and remanded "for judgment for defendant VPCA on plaintiff's petition and judgment in an amount determined by the trial court on defendant's counterclaim." *Fricke I*, 721 S.W.2d at 755[5, 6]. Upon retrial, the jurisdiction of the trial court was limited solely to a determination of the damages due VPCA on its counterclaim for conversion of the cattle proceeds. *See Brooks*, 637 S.W.2d at 138[2]. Thus, the trial court erred in considering waiver, a

legal issue not presented nor tried in *Fricke I,* in its determination of damages.

■ Fricke contends that to allow VPCA's recovery for conversion of the cattle sales proceeds in effect results in a double recovery. Fricke argues that he used the proceeds of the cattle Hartman sold to purchase other cattle which VPCA subsequently rounded up and sold, and thus, no damages resulted to VPCA from the sales by Hartman.

The United States Court of Appeals, Eleventh Circuit, in *Taylor Rental Corp. v. J.I. Case Co.,* 749 F.2d 1526 (11th Cir.1985), addresses Fricke's argument. In *Taylor,* the secured party had repossessed and sold certain equipment of the defaulting debtor under the terms of its security agreement. The secured party then sued in conversion to recover from a third party the value of equipment that had been previously traded-in without the secured party's knowledge or authorization. The Eleventh Circuit, citing Fla. Stat. § 679.306(2), which is essentially similar to Missouri's statute, § 400.9–306(2) RSMo 1978, held that the secured party could, after conducting a sale of the equipment, maintain an action for conversion for the proceeds of the traded-in equipment against a third party. *Taylor,* 749 F.2d at 1529[1–4]. The court reasoned that even though the new equipment received through trade-in could be considered as proceeds of the traded-in equipment, it also could be separately considered to be after-acquired property in which the secured party had a perfected security interest. *Taylor,* 749 F.2d at 1529[6]. Therefore, the secured party still would retain a perfected security interest in the proceeds of the traded-in equipment. *Id.* The court concluded by stating that the secured party "is merely exercising its right to pursue the cumulative remedies available to it to seek satisfaction of the debt." *Taylor,* 749 F.2d at 1529; *See* § 400.9–501 RSMo 1978.

Here, the cattle purchased following the sales of the other cattle is separate collateral, subject to VPCA's valid security interest in after-acquired property. Therefore, when VPCA repossessed and sold all of the cattle on Hartman's properties, including these after-acquired cattle, VPCA still could proceed in an action for conversion against Fricke, as a third party, for the proceeds of the cattle sales. Thus, Fricke's argument is without merit.

■ To conclude that Fricke is liable to VPCA for conversion of the cattle proceeds, the proceeds must be identifiable. *Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville,* 358 F.Supp. 317, 323[2] (1973); § 400.9–306(2) RSMo 1978. VPCA argues that the undisputed evidence on remand established that the amount of damages was $59,387.63, plus prejudgment interest.

The proceeds from the five cattle sales are ascertainable directly from Fricke's own testimony at trial. The testimony and the evidence at trial established the following:

| Date | Place | Number | Net Proceeds |
|---|---|---|---|
| Sept. 14 | Callaway Stock Sales Co. | 59 | $15,498.55 |
| Sept. 15 | Central Missouri Livestock Auction Co. | 29 | $ 9,378.09 |
| Oct. 2 | Olean Livestock Market | 66 | $12,337.84 |
| Oct. 6 | Central Missouri Livestock Auction Co. | 19 | $ 2,990.87 |
| Oct. 7 | Rhineland Missouri Texas | 87 | $19,182.28 |
| TOTAL | | 260 | $59,387.63 |

Evidence introduced at trial shows that the proceeds of the first four sales were directly deposited into Fricke's business account. Clearly, these proceeds are identifiable. *John Deere Co. v. Jeff DeWitt Auction Co.,* 690 S.W.2d 511, 513[1] (Mo.App. 1985).

The proceeds of the fifth sale of cattle by Hartman were retained by Hartman with Fricke's assent in order to satisfy the preexisting debt Fricke still owed on the fourth cattle purchase.

■ Fricke argues that he did not control this sale and therefore should not be liable for conversion of the proceeds from this sale. Evidence at trial shows that Fricke agreed to this shipment and sale of 87 head of cattle.

Q: Do you know anything about those cattle?

A: Well, they were the cattle that were shipped to Texas for sale.

Q: Did you get any money as a result of that sale?

A: I did not.

Q: Did you know they were going to Texas to be sold?

A: Yes, I did.

Q: How did you know that?

A: Well, Bob Hartman or else along with that I was in contact with him to the effect that the $75,000.00 had been used up and the last purchase of 187 had couldn't be covered and that he needed to sell some of the cattle in order to finalize the purchase of those cattle so the next day then or so he called back and said that he had a sale for 87 head of cattle if we could ship them to Texas.

Q: You agreed to that?

A: Yes, I did.

Where goods have been converted, an individual who has knowledge of the conversion and who benefits by the proceeds, in whole or in part, is liable as a principal. *Crowe v. Coursey*, 601 S.W.2d 650, 655[6–7] (Mo.App.1980). Fricke clearly assented and had knowledge of the sale. He also benefited from the proceeds as they were used to satisfy the debt he owed to Hartman for the fourth cattle purchase pursuant to their agreement that Fricke would reimburse Hartman for any cattle purchases, and that they would split the profits from the cattle sales. Thus, the evidence is sufficient to show that Fricke is liable for conversion of the proceeds of the fifth sale of cattle.

The proceeds of this fifth sale were clearly established through testimony and evidence to be $19,182.28. These proceeds are identifiable and are recoverable by VPCA. Thus, we conclude that Fricke is liable to VPCA for conversion for the full value of the proceeds from the five cattle sales, $59,387.63.

VPCA also claims that it is entitled to recover prejudgment interest from the date its collateral was converted. "The general rule is that in actions of trover, or actions in the nature of trover, for the conversion of property, interest or the equivalent of interest on the value of the property converted by be recovered."

*Hammons v. Eisert*, 745 S.W.2d 253, 259[5] (Mo.App.1988); *Independence Flying Service, Inc. v. Ailshire*, 409 S.W.2d 628, 632[7] (Mo.1966). Section 408.020 RSMo Supp.1980 prescribes the statutory interest rate to be nine percent.

Thus, VPCA is entitled to receive judgment in the amount of $59,387.63, plus prejudgment interest at the statutory rate of nine percent from the date of the conversion of the proceeds of the five cattle sales.

Finally, VPCA argues that the trial court's order ignores Article Nine of the Uniform Commercial Code. We do not review this argument as we have already addressed this in VPCA's initial argument and found it to be dispositive of this appeal.

Thus, we conclude that the trial court erred in awarding VPCA only nominal damages of one dollar. We reverse and remand with direction to the trial court to enter judgment in the amount of $59,387.63 plus prejudgment interest computed at the statutory rate of nine percent from the date of the receipt of the proceeds from the cattle sales.

Judgment reversed and remanded.

DOWD, P.J., and HAMILTON, J., concur.