A separate Judgment in accordance with this memorandum and order is entered this same date.

### *JUDGMENT*

In accordance with the memorandum and order entered this same date,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that plaintiffs shall have summary judgment against defendants, and that defendants, their successors, agents and employees, are **PERMANENTLY ENJOINED and RESTRAINED** from the following:

1. Implementing, enforcing or acting in reliance upon § 130.130 of Proposition A and § 130.052, § 130.053, and § 130.031.12, R.S.Mo. (1995).

2. Applying the definition of "contribution" contained in § 130.011(12)(a), R.S.Mo., to the contribution limits contained in § 130.100 of Proposition A, that is, applying or enforcing the statute so that candidates for office would be limited in the amounts they may personally contribute to or spend on behalf of their own campaigns.

**WHIRLPOOL FINANCIAL CORPORATION,**
Plaintiff,

v.

**MERCANTILE BUSINESS CREDIT, INC., Defendant.**

No. 4:94CV00364 GFG.

United States District Court,
E.D. Missouri,
Eastern Division.

July 11, 1995.

David P. Weiss, Weiss and Associates, St. Louis, MO, for Whirlpool Financial Corp., plaintiff.

Robert H. Brownlee, Sr., Thompson and Mitchell, St. Louis, MO, for Mercantile Business Credit, Inc., defendant.

### *MEMORANDUM*

GUNN, District Judge.

This matter is before the Court following a bench trial held from June 12, 1995 through June 15, 1995.

Plaintiff Whirlpool Financial Corporation (Whirlpool) filed suit against Mercantile Business Credit, Incorporated (MBCI), Richard Sullivan, Robert Bumberry, Richard

Weber and Donald Hindman. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. In an Order dated June 9, 1995, this Court dismissed all counts against the individual defendants. At trial, counts I, II and III for an accounting, conversion and unjust enrichment respectively remained against MBCI.

## *I. Findings of Fact*

1. Whirlpool and MBCI are engaged in the business of asset-based commercial lending. At all relevant times Consolidated Convenience Systems, Inc. (CCSI), formerly known as North American Capital Group, Inc., was the majority shareholder in Anda, Inc. (Anda) and the sole shareholder of Ozark Grocer, Inc. (Ozark). (Stip.)

2. Anda was a wholesale distributor of cigarettes, tobacco products and grocery products to convenience stores. Ozark also was a wholesale distributor of the same types of products to convenience stores. Both Anda and Ozark were based in Springfield, Missouri. (Stip.)

3. At all relevant times, Richard Sullivan was a stockholder, director, and Chief Executive Officer of CCSI and a director and Chairman of Anda. (Stip.)

4. At all relevant times, Robert Bumberry was a director and officer of Anda and president of Ozark. (Stip.)

5. At all relevant times, Richard Weber served as Chief Financial Officer of CCSI and a vice president of both Anda and Ozark. (Stip.)

6. Robert Price was senior vice president in charge of client relations for Whirlpool from 1989 until August, 1993. Price oversaw and monitored certain loan agreements including the LSA between Whirlpool and Anda. Price worked on the LSA documentation relating to Anda and was present when the LSA was signed in Chicago in November of 1989. (Price Test.)

7. At all relevant times, Michael O'Neal was vice president in charge of managing account executives at Whirlpool and worked on the Anda account. (O'Neal Dep. at 165.) Whether O'Neal is currently employed by Whirlpool is unclear.

8. At all relevant times, Jean Elie was an account executive and an auditor for Whirlpool. Before becoming an account executive, Elie had conducted audits of Anda. As an account executive, Elie worked on the Anda account and took over its management sometime before October of 1992. He currently works for the same financial company as Price. (Elie Test.)

9. At all relevant times, Lori Possley–Miazga was the account executive who oversaw the Anda account until sometime before she left on maternity leave in October of 1992. (Possley–Miazga Dep. at 5–6.)

10. Robert Early is an investment banker who at all relevant times was an investor in and employee of CCSI and a director of Ozark. (Early Test.)

11. At all relevant times, James Winschel was the vice president and managing director of the commerce finance division for Whirlpool. (Winschel Dep. at 9.)

12. From March of 1992 to February of 1993, Brad Hall worked for Anda and Ozark as a credit manager. (Hall Dep. at 6–7.)

13. Larry McMullin joined Anda in May of 1990 as vice president of finance. In August of 1991, he became comptroller for Anda. (McMullin Dep. at 6–7.)

14. On November 27, 1989, Whirlpool entered into a Loan and Security Agreement (LSA) with Anda. (Stip.)

15. Pursuant to the LSA between Whirlpool and Anda, Whirlpool's loan to Anda included four separate extensions of credit: (1) a $1,250,000 senior real estate term loan; (2) an $800,000 senior machinery and equipment term loan; (3) a $2,500,000 senior subordinate term loan; and (4) an $11,000,000 revolving line of credit. (Stip.)

16. As security for Anda's obligations under the LSA, Anda granted Whirlpool a security interest in, among other things, Anda's inventory, accounts, general intangibles, equipment, furniture and fixtures, contract rights, and proceeds from all of the above. (Stip.)

17. Whirlpool perfected its security interest in that collateral by filing UCC–1 financial statements with the appropriate filing

offices in Kansas, Kentucky and Missouri on or before January 31, 1991. (Stip.)

18. Under the LSA, the sale of inventory was permitted "only in the ordinary course of business, unless written permission the contrary is obtained from Whirlpool." (Pl.Exh. 66 at ¶ 8.1.3.)

19. The LSA prohibited Anda from entering into any "sales or other transactions with any affiliates on terms less favorable than ... from a nonaffiliate." (Pl.Exh. 66 at ¶ 8.2.10.)

20. The LSA also prohibited Anda from making any loans to affiliates. (Pl.Exh. 66 at ¶ 8.2.13.)

21. The loan from Whirlpool to Anda performed satisfactorily during 1990 with only minor inaccuracies in the inventory balances. (Price Test.)

22. Auditors would come in twice a year to make sure that all of Anda's financial records were accurate and in order and to check on whether Anda owned its inventory since Anda's good title was the key to Whirlpool's maintenance of its security interest in Anda's inventory. (Price Test.)

23. Price testified that Anda was in the business of distributing candy and cigarettes to places like Walmart and small convenience food store chains. Typically, Anda would receive payment within thirty days, fifteen to twenty days on average, from its customers. (Price Test.) Anda never charged interest to its customers on late payments. (Hall Dep. at 20–21.)

24. Anda submitted borrowing base certificates daily to Whirlpool. These certificates would then be used by Whirlpool to calculate the amount of working capital it would advance Anda. Such certificates would not have revealed an intercompany receivable because such an account would have been considered an "ineligible." Ineligibles included that which could not have been counted in the formula in place to calculate extensions of working capital credit made by Whirlpool to Anda. The intercompany receivable between Anda and Ozark was considered an ineligible. (Price Test.; Pl.Exh. 32.)

25. Information regarding the intercompany receivable was available in Anda's financial statements and in its general ledger although not all sales were recorded on invoices. The receivable was also tracked by a rollforward report maintained by McMullin. (Pl.Exh. 85; Weber Dep. at 190; Elie Test.; Elson Test.; McMullin Dep. 84–85.)

26. Throughout its relationship with Whirlpool, Anda had an on-going problem with its reporting practices. Anda's financial statements, which revealed the intercompany receivable, were often delinquent by a few months. (Price Test.; Elie Test.)

27. Certain problems with Anda's accounting practices and procedures were also recurring. Anda had a substantial inventory "write down" where the books did not match the inventory amount. The accounts receivable were not always accurate. Anda functioned as five separate entities or divisions; this created administrative difficulties in coordinating the reporting of all the managers' reports. The divisions transferred inventory between themselves which were called intercompany receivables although they were just transfers. If the accounts receivables were wrong then this created problems for Whirlpool in determining the appropriate borrowing base. (Elie Test.)

28. In March, 1991, CCSI acquired the stock of Ozark, a deal that was financed by MBCI, and MBCI began providing financing to Ozark. (Stip.) Whirlpool refused to finance the acquisition. (Price Test.)

29. Pursuant to its loan and security agreement with Ozark, MBCI provided Ozark with day-to-day financing and took a security interest in virtually all of Ozark's assets, including Ozark's inventory and accounts receivable. (Stip.)

30. Under its lending arrangements with MBCI, Ozark deposited the collections of its accounts receivable into a blocked account at Commerce Bank of Springfield. From time to time the blocked account was swept by automated clearing house transfer and the funds were applied to MBCI's loan balance. When Ozark required funds for its operations, it borrowed them from MBCI. (Stip.)

31. In 1991, CCSI management began developing a business plan to improve the profitability of Anda based on the suggestions of

a financial consultant. The plan had several goals: reduce the number of warehouses; reduce the cost of using warehouses; lower the amount of inventory; make management of inventory more efficient; reduce personnel; and improve profitability. CCSI's acquisition of Ozark was part of that plan. The plan was eventually coined "Operation Smart Move." (Early Test.)

32. Through Operation Smart Move, Anda and Ozark would consolidate their operations and in order to maximize discounts from volume purchases: Anda would buy all the cigarettes and tobacco products for the two companies and Ozark would purchase all the grocery items for the two companies. The companies would then sell inventory to one another at cost. (Elie Test.; Early Test.)

33. Whirlpool knew about plans to consolidate Ozark and Anda operations as soon as May of 1991. (Def.Exh. 20; Possley–Miazga Dep. at 114.) Whirlpool also knew that Operation Smart Move meant that Ozark would buy all of its cigarette and tobacco products from Anda to take advantage of volume discounts; Whirlpool knew that such sales would be at cost. (Elie Test.; O'Neal Dep. at 287–89.)

34. Whirlpool approved of Operation Smart Move before April of 1992, agreed to let Anda store its inventory in Ozark's warehouse, and authorized the sale of some of its inventory to Ozark. (Elie Test.; Early Test.; O'Neal Dep. 288, 405–406; Pl. Proposed Findings of Fact (Doc. No. 95) at ¶ 9.)

35. By approving of Operation Smart Move, Whirlpool authorized the sale of tobacco products by Anda to Ozark at cost. Such sales were prohibited by the LSA because they were sales to an affiliate with terms less favorable to Anda than sales nonaffiliates. The sales also violated the LSA because they were not in the ordinary course of business; they were for cost and were part of an overall, unique consolidation scheme. The Court finds that the preponderance of the evidence establishes that Whirlpool authorized these sales although they violated the terms of the LSA.

36. An audit dated August 2, 1991, indicated that Anda and Ozark were buying and selling items "on account" from one another.

(Pl.Exh. 69 at W00895, W00906.) This report provided clues regarding the potential for a high intercompany receivable between Anda and Ozark. (Elie Test.; Def.Exh. 6.) Elie testified that at the time early information suggesting an intercompany receivable around $100,000 would have been disregarded as not "material." (Elie Test.)

37. By January of 1992, Whirlpool was aware that Anda and Ozark might be engaged in transactions for more than $750,000 worth of inventory. At that time, Whirlpool and Anda entered into a refinancing agreement which placed a limitation on distributions of more than $750,000 to shareholders and affiliates "provided, however, that this limitation shall not apply to intercompany sales between" Anda and Ozark. (Def.Exh. 73A at 4.)

38. In accordance with Operation Smart Move, at some point during March of 1992, Ozark began buying all of its cigarette and tobacco products from Anda and Anda began purchasing all of its candy and grocery products from Ozark. (Def.Exh. 5; Pl.Exh. 86.)

39. Whirlpool's primary concern regarding the intercompany receivable was that the intercompany activity be considered an ineligible. (Pl.Exh. 80.) In a letter dated March 20, 1992, Possley–Miazga described her concern that Anda's reporting procedures might lead to the inadvertent inclusion of the intercompany receivable in the borrowing base. (Id. at 1; Weber Dep. 253–53.)

40. Possley–Miazga received financial statements from Anda on May 8, 1992 which detailed the $538,000 intercompany receivable as of March 21, 1992. (Def.Exh. 5.) Price admitted that he knew of this intercompany receivable from Possley–Miazga and that he did not ask Possley–Miazga to keep him posted on the intercompany receivable because the amount was not "material." (Price Test.)

41. Elie also testified that such an amount was not "material." (Elie Test.)

42. Price, Possley–Miazga, Sullivan, Early and Weber met in Springfield, Missouri on April 15, 1992. Price and Possley–Miazga saw a presentation by Anda which explained operational changes and Ozark and Anda's

consolidation efforts. Price and Possley–Miazga toured Ozark's warehouse where Anda's inventory occupied the second floor. The group then had lunch at a local country club. (Price Test.; Early Test.)

43. Price testified that when he was told at the lunch that Ozark planned to purchase its cigarette and tobacco products exclusively from Anda, he told Sullivan, Weber, and Early that all such sales must be for cash only. Price's testimony on this point lacks credibility in light of other evidence before this Court and the Court's assessment of Price's demeanor and manner while on the stand. Price admitted that he did not remember whether anyone at the lunch responded to his statements that intercompany transfers should only be cash sales. (Price Test.)

44. Early, who attended the Springfield meeting and lunch, testified that Price never mentioned anything about sales between Anda and Whirlpool being for cash only. He stated that the idea of cash only sales was not raised with him until August, 1992. (Early Test.) The Court finds Early to be a credible witness on this point in light of other evidence before this Court and the Court's assessment of Early's demeanor and manner while on the stand.

45. Possley–Miazga did not recall whether Price raised the cash only issue at the luncheon or any time during their visit to Springfield. (Possley–Miazga Dep. at 54.)

46. Sullivan did not recall anyone from Whirlpool telling him that the sales from Anda to Ozark should be on a cash only basis. (Sullivan Dep. at 153–57.)

47. Price admitted that before writing a default letter dated September 9, 1992, he never put into writing that he suggested to Anda officers that sales to Ozark should be cash only. (Price Test.)

48. Plaintiff has not provided the Court with any document referencing any understanding between Whirlpool and Anda that sales from Anda to Ozark had to be on a cash only basis. (Price Test.; Elie Test.; Possley–Miazga Dep. at 94–105.)

49. Possley–Miazga stated that during the Spring of 1992 Weber told her that the sales between Anda and Ozark would be for cash; however, she did not remember ever telling Anda or Ozark officials before August of 1992 that intercompany sales on anything other than a cash basis were not authorized. (Possley–Miazga Dep. at 94–105.)

50. Elie testified that until November of 1992 he did not discuss with anyone at Anda the idea that sales between Ozark and Anda should be for cash only. (Elie Test.)

51. Possley–Miazga received Anda's financial statements for the period ending May 16, 1992, on July 8, 1992. (Def.Exh. 2.) The statements revealed an intercompany receivable of over $800,000. *Id.* at W03510.

52. However, the July 31 draft of Whirlpool's audit report for the period ending May 16, 1992 revealed an intercompany receivable of either $401,000 or $156,570. (Pl.Exh. 71 at W05735, W05743.)

53. Anda's June financial statement arrived August 3, 1992 and revealed a $1,633,991.96 intercompany receivable. (Def.Exh. 62 at W03437.)

54. Whirlpool auditors were not able to reconcile this figure with those appearing in their audit report. (Elie Test.)

55. Upon receiving the June financial statements from Anda, Whirlpool officials became concerned that the high intercompany receivable would jeopardize Anda's ability to secure working capital from Whirlpool. (Price Test.; Elie Test.)

56. Elie testified that he had a meeting with O'Neal just after receiving another set of financial statements from Anda for the period ending June 13, 1992, which came in on August 3, 1992. Elie described O'Neal as being "alarmed" by the size of the intercompany receivables (approximately $1,700,000) because it eclipsed the earlier July audit. (Elie Test.)

57. On August 17, 1992, Whirlpool officials had a meeting to discuss the problems with Anda, including the high intercompany receivable. They spoke with Robert Early on the phone. (Price Test.; Elie Test.; Early Test.)

58. The list of audit concerns to be used as a loose agenda for the August 17, 1992 meeting of Whirlpool officials did not reference the size of the intercompany receivable;

it mentioned only a need for better accounting procedures to track the receivable. (Pl. Exh. 76.)

59. Early testified that he was surprised to learn of the intercompany receivable in August of 1992. He had not known how Ozark and Anda were transacting business. He described the sales as unusual but explained that Ozark and Anda had a symbiotic relationship to a certain extent: Ozark depended upon Anda for cigarettes and Anda depended upon Ozark for its warehouse and for candy and groceries. (Early Test.)

60. Shortly thereafter, Early determined and reported to Whirlpool officials that the immediate payment of the receivable by Ozark was not feasible. (Early Test.)

61. Gordon Fraser, Chief Investment Officer of Whirlpool, wrote Sullivan a letter dated August 20, 1992. (Pl.Exh. 9.) The letter mentions Whirlpool's concern regarding the intercompany receivable but it does not document any requirement by Whirlpool that the receivable be paid, nor does the letter support any contention that Anda understood that Whirlpool did not authorize the creation of the intercompany receivable. *Id.*

62. O'Neal told Early at the end of August, 1992 that he wanted either the entire intercompany receivable paid immediately or Anda put back the way it used to be before Operation Smart Move. Early told O'Neal that neither solution was possible. (Early Test.)

63. Early testified that later he spoke directly with Fraser and Winschel and that they told him to have the companies continue operating as they had been. The Court finds his testimony to be credible. (Early Test.)

64. The Court finds, and the preponderance of the evidence suggests, that Whirlpool never communicated to Anda any objections to the intercompany receivable, or any cash only requests, until August, 1992.

65. The Court further finds that Whirlpool, by its course of conduct, implicitly authorized the sale of goods between Anda and Ozark on account.

66. Beginning August 11, 1992, Ozark began making payments to Anda of $50,000 per day. The payments continued until the end of November, 1992. However, on some business days, no payment was made or a payment was made that exceeded $50,000. (Pl. Exh. 25 at W01966–67.)

67. The $50,000 payments arose out a plan developed by Weber and McMullin to manage intercompany activity at that time to at least maintain the intercompany receivable. (Weber Dep. at 57–58; Pl.Exh. 67 McMullin Aff. at 5; Early Test.) Weber recommended payments of $50,000 per day by Ozark to Anda to reflect the volume of Ozark's purchases (between $200,000 and $250,000 of inventory per week.) (Weber Dep. at 57–58.)

68. Elie testified that sometime during the fall of 1992, there was a meeting in Springfield, Missouri, between Whirlpool and Anda officials. Elie testified that a $50,000 per day amortization plan was discussed and formulated. Ozark would pay Anda $50,000 per day until the intercompany receivable was paid off. Elie admitted, however, that no documentation exists to support this proposed arrangement. (Elie Test.) Early could not recall any such agreement. (Early Test.)

69. The Court does not find Elie's testimony to be credible regarding the so-called $50,000–per–day agreement in light of other evidence before this Court and the Court's assessment of Elie's demeanor, manner and motive. Furthermore, Elie's testimony contained inconsistencies. In particular, at one point, Elie stated that he did not learn of the intercompany receivable until August of 1992. Elie later testified that by June or July of 1992, he knew that as of March, 1992 the practice of intercompany sales between Ozark and Anda began and that by the end of March, a $500,000 intercompany receivable was in place. (Elie Test.)

70. MBCI's expert, David Clark Potter, a partner in Peat Marwick, an accounting firm, testified that he reviewed documentation regarding Anda and Ozark, including the roll-forward of transactions and inventory, the September 9, 1992 default letter and various depositions. (Potter Test.) Potter concluded that Ozark's purchases of cigarette and tobacco products from Anda from August 11, 1992 through December 2, 1992, were in effect made on a cash basis. (Potter Test.;

Def.Exh. 74 at 1.) During cross-examination, Potter indicated that transactions can be on a cash basis and still not involve the daily settlement of an account. (Potter Test.) The Court notes that typically Anda would not receive payment from its other customers for fifteen (15) to twenty (20) days after delivery without collecting any interest. *See infra* ¶ 23.

71. Potter's testimony is credible and his analysis sound. This Court therefore finds that Ozark's purchases of cigarette and tobacco products from Anda from August 11, 1992 through December 2, 1992, were in effect made on a cash basis.

72. On or about September 9, 1992, Whirlpool declared its loan to Anda to be in default. (Stip.)

73. O'Neal sent Sullivan a letter dated September 9, 1992 ("the default letter") in which O'Neal outlined the areas where Whirlpool considered Anda to be in default. (Pl.Exh. 11.) The letter cited the high intercompany receivable as an instance of default. *Id.* at 1–2.

74. The default letter contained certain *"suggestions"* including that Ozark pay the intercompany receivable by October 3, 1992, and that all future sales between the two companies be "on a cash basis." *Id.* at 2.

75. The letter also contained a separate list of "changes in procedure that WFC [Whirlpool] will *require* immediately." *Id.* at 3 (emphasis added).

76. Price testified that Whirlpool did not accelerate its loan during August of 1992 and into autumn because it wanted to find the best means to salvage the loans through repayment of the intercompany receivable in the normal course of activity.

77. Whirlpool considered many alternatives on how to take care of Anda's problems. Whirlpool considered financing Ozark to finance both sides of the operation but rejected the idea. Whirlpool also explored the possible sale by CCSI of Anda and Ozark; however, the idea was pursued without success. (Price Test.; Elie Test.; Early Test.)

78. On or about October 9, 1992, MBCI declared its loan to Ozark to be in default. (Stip.)

79. Whirlpool approved at least one over-advance to Anda during October of 1992, of about $500,000. (Def.Exh. 46.)

80. In a letter dated November 20, 1992, from O'Neal to Early, O'Neal told Anda to "formally request in writing that Ozark provide Anda with a security interest in Ozark's assets that would be subordinate to Mercantile Bank's security interest in Ozark's assets" to secure the intercompany receivable. (Def.Exh. 55 at 2.)

81. Early made that request to MBCI. MBCI rejected the idea, and Early told Whirlpool of MBCI's response. (Early Test.)

82. On November 30, 1992, Anda hired a turn around consultant. (Def.Exh. 13.)

83. Ozark and Anda ceased operations at approximately the same time in early December of 1992. (Stip.)

84. Ozark surrendered its assets and inventory to MBCI. (Stip.)

85. Price wrote a letter dated December 7, 1992 to MBCI and Ozark. The letter discusses Whirlpool's belief that assets of Ozark and Anda were commingled. Price testified that he wanted the letter to put MBCI on notice that assets should be turned over to Whirlpool and that information MBCI possessed regarding the situation should also be given to Whirlpool. (Price Test.; Pl.Exh. 28.) Price testified that he followed up on the letter and contacted Paul Piechowski of MBCI regarding the letter's request for information. Price admitted knowing that MBCI financed CCSI's acquisition of Ozark; however, he did not recall ever sending a letter to MBCI before the December 7 correspondence. (Price Test.)

86. In December, 1992, when Anda ceased operations, the intercompany balance owed by Ozark to Anda, to the extent actually verified by Whirlpool's expert, was $1,261,804. (Elson Test.; Pl.Exh. 81 at sec. IV, tab 6.) The payment program instituted on August 11, 1992 thus provided for actual payments to Anda for an amount at least equal to Ozark's post-August 11, 1992 purchases from Anda.

87. Whirlpool is seeking to recover from MBCI proceeds from the sale of all the ciga-

rette and tobacco inventory transferred from Anda to Ozark.

## II. Conclusions of Law

89. Missouri law applies, and so Whirlpool's security interest in the transferred inventory is governed by Article 9 of Missouri's Uniform Commercial Code, Mo.Rev. Stat. §§ 400.9–101 *et seq.* *See* Mo.Rev.Stat. §§ 400.9–102(1)(a), 400.9–104.

90. Whirlpool's claims against MBCI are for conversion, an accounting and unjust enrichment. Whirlpool's claims against MBCI all have at their foundation Whirlpool's rights as a secured party to certain sums in MBCI's possession.

91. "Conversion is the wrongful exercise of dominion or ownership over a chattel. The gist of the modern action, whatever the actual variety, is tortious interference with the right of possession." *Ensminger v. Burton,* 805 S.W.2d 207, 210–11 (Mo.Ct.App. 1991) (citations omitted.)

92. Unjust enrichment presupposes that the defendant was enriched with some benefit at the expense of the plaintiff such that it would be unjust to allow the defendant to retain that benefit. *American Civil Liberties Union v. Miller,* 803 S.W.2d 592, 595 (Mo.1991); *Ticor Title Ins. Co. v. Mundelius,* 887 S.W.2d 726, 727 (Mo.Ct.App.1994).

93. If Whirlpool is not entitled to certain proceeds it claims MBCI possesses, then its claims for conversion and unjust enrichment against MBCI must fail.

94. If Whirlpool's underlying claims for relief fail, so too must its claim for an accounting. *Weltscheff v. Medical Center of Independence,* 604 S.W.2d 796, 801 (Mo.Ct. App.1980).

95. Under § 400.9–306(2), when a debtor makes an unauthorized sale of collateral, the buyer takes the collateral subject to the security interest, and in an action for conversion, the secured party may recover the proceeds or the collateral from any transferee.[1] *Alpine Paper Co. v. Lontz,* 856 S.W.2d 940, 943 (Mo.Ct.App.1993) (citing *Fricke v. Valley Prod. Credit Ass'n,* 778 S.W.2d 829, 833 (Mo.Ct.App.1989)).

96. If the debtor's sale of the collateral is authorized, either expressly or impliedly, then the secured party surrenders its security interest and must look only to the debtor personally for payment of the debt. *Charterbank Butler v. Central Cooperatives, Inc.,* 667 S.W.2d 463, 465 (Mo.Ct.App.1984); *Farmers & Merchants Bank v. Borg–Warner Acceptance Corp.,* 665 S.W.2d 636, 640 (Mo. Ct.App.1983).

97. Authorization may be established by implication arising from a course of conduct. *Springfield Mercantile Bank v. Joplin Stockyards,* 870 F.Supp. 278, 283 (W.D.Mo. 1994).

98. The secured party has the burden of proof and must show that it did not authorize, either expressly or impliedly, the debtor's sale of the collateral. *Farmers,* 665 S.W.2d at 640.

99. Whirlpool did not establish by a preponderance of the evidence that its authorization of the sale of collateral in this case was limited to sales being on a "cash only" basis. Whirlpool knew about Operation Smart Move and authorized sales between Anda and Ozark for cost although such transactions would violate the terms of the LSA. *See infra* ¶¶ 33–35. Whirlpool did not produce any materials documenting any communication between itself and Anda that sales between Anda and Ozark be conducted on a cash only basis. *See infra* ¶ 48. Whirlpool offered no credible testimony that Whirlpool officials told Anda before August, 1992 that Whirlpool would only authorize cash sales. *See infra* ¶¶ 42–47, 49–50, 64.

Furthermore, information regarding the receivable was available in Anda's financial statements, its general ledger and the rollforward report. *See infra* ¶ 25. Whirlpool knew of Anda's on-going delinquent reporting practices and accounting deficiencies. *See infra* ¶¶ 26–27. Whirlpool also knew as early as August, 1991 that Anda and Ozark

---

1. This is true unless the transferee is a buyer in the ordinary course. *See* Mo.Rev.Stat. § 400.9– 307. MBCI is not a buyer in the ordinary course because, *inter alia,* it allegedly accepted cigarettes and proceeds from the sale of the same in satisfaction of a debt. Mo.Rev.Stat. § 400.1– 201(9).

might be selling "on account to one another" and knew as early as January, 1992 that the two companies would be doing more than $750,000 worth of business with one another. *See infra* ¶¶ 36–37. Yet, Whirlpool did not contact Anda with concerns about the inter-company receivable until its size reached a "material" level as disclosed in the June financial statements received on August 3. *See infra* ¶¶ 36, 40, 49, 51–58.

The Court need not decide whether Whirlpool narrowed the scope of its authorization to the sale of collateral on a cash only basis either orally after the August 17 meeting or in the default letter. The Court finds above that Ozark's purchases of cigarette and tobacco products from Anda between August 11, 1992 through December 2, 1992 were in effect made on a cash basis. *See infra* ¶¶ 66–72.

100. Based upon the above Findings and as an additional and alternative Conclusion, the Court finds that the actions and inactions of Whirlpool's employees, described above, give rise to a waiver and estoppel against Whirlpool, preventing it from claiming that its security interest in Anda's tobacco inventory was not extinguished upon purchase of that inventory by Ozark. *Neu Cheese Co. v. FDIC*, 825 F.2d 1270, 1272–73 (8th Cir.1987) (interpreting Nebraska provision identical to Mo.Rev.Stat. § 400.9–306(2)); *Pieper v. First Nat. Bank of Linn Creek*, 453 S.W.2d 926, 931 (Mo.1970). *See infra* ¶ 99.

101. Based upon the above Findings and Conclusions, Whirlpool's claims against MBCI must fail because Whirlpool has no continuing interest or right in the cash proceeds received by MBCI. Therefore, the Court will enter judgment in favor of the defendant and against plaintiff.